## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ALTA MESA RESOURCES, INC., *et al.*, | § | Case No. 19-35133 |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |
| ALTA MESA HOLDINGS, LP, and | § | |
| OKLAHOMA ENERGY ACQUISITIONS, LP | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Adv No. 19-3609 |
| KINGFISHER MIDSTREAM, LLC, | § | |
| OKLAHOMA PRODUCED WATER | § | |
| SOLUTIONS, LLC, | § | |
| | § | |
| Defendants. | § | |
| | § | |

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. BANKR. P. 7056 WITH RESPECT TO DEBTORS' ADVERSARY COMPLAINT FOR DECLARATORY RELIEF

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE BY NOVEMBER 18, 2019. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING ON NOVEMBER 22, 2019. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

---

[1] The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Alta Mesa Resources, Inc. (3840); Alta Mesa Holdings, LP (5150); Alta Mesa Holdings GP, LLC (N/A); OEM GP, LLC (0958); Alta Mesa Finance Services Corp. (5673); Alta Mesa Services, LP (7295); and Oklahoma Energy Acquisitions, LP (3762). The location of the Debtors' corporate headquarters and service address is 15021 Katy Freeway, 4th Floor, Houston, Texas 77094.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... III

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ..................................................................................... 2

I.      The Parties and Other Entities ................................................................. 3

II.     The Original Gathering Agreements ........................................................ 3

III.    The Amended Agreements ....................................................................... 4

IV.     Procedural History ................................................................................... 5

ARGUMENT ....................................................................................................... 6

I.      The Gathering Agreements Do Not Create Covenants That Run with the Land ............... 6

        A.      There Is No Privity of Estate Between KFM and AMH ........................................ 7

                1.      Oklahoma Law Requires Horizontal Privity of Estate for a Covenant
                        to Run with the Land .......................................................... 8

                2.      KFM Cannot Meet Its Burden to Establish Horizontal Privity of
                        Estate ................................................................................ 10

                        i.      The Agreements' "Transportation Interests" Are Not Interests
                                in the Mineral Estate ................................................ 11

                        ii.     Minerals "Produced and Saved" Are Not an Interest in the
                                Mineral Estate ............................................................ 13

                        iii.    Section 4.2's So-Called Easement Is Not an Interest in the
                                Mineral Estate ............................................................ 15

                                a.      KFM's Easement in Gross Is Not a Real Property
                                        Interest ............................................................ 15

                                b.      The Easement Is Not a Conveyance of a Real Property
                                        Interest in AMH's Mineral Interests ....................... 18

                                c.      KFM's Purported Easement Is a License ................ 19

                                d.      The Easement Was Not Conveyed at the Same Time as
                                        the Covenant ..................................................... 22

**TABLE OF CONTENTS—Continued**

Page

B.    The Covenant Does Not Touch and Concern the Land ........................................ 24

     1.    The Covenant "Affects" Only Extracted Oil and Gas, Not the Land from which They Are Extracted ............................................... 25

     2.    The Covenant Does Not Affect the Value of or Lessen AMH's Legal Relations to Its Leased Lands ................................................. 26

II.    The Covenants Are Not Enforceable as Equitable Servitudes........................................ 29

A.    The Covenant Does Not Limit the Use of the Land ............................................ 30

B.    The Covenant Benefits KFM Personally, Not in Relation to KFM's Land.......... 31

CONCLUSION.................................................................................................... 33

CERTIFICATE OF SERVICE ............................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atlanta Consol. St. Ry. Co. v. Jackson*,
  34 S.E. 184 (Ga. 1899)................................................................................................8

*In re Badlands Energy, Inc.*,
  No. 17-01429-KHT, 2019 WL 5549463 (Bankr. D. Colo. Sept. 30, 2019) .....................28, 29

*Beattie v. State ex rel. Grand River Dam Auth.*,
  41 P.3d 377 (Okla. 2002) ..................................................................................... *passim*

*Champlin Exploration, Inc. v. W. Bridge & Steel Co., Inc.*,
  597 P.2d 1215 (Okla. 1979)...................................................................................12, 25, 30

*Clear Lake Water Authority v. Clear Lake Utilities Co.*,
  549 S.W.2d 385 (Tex. 1977)........................................................................................31

*District of Columbia v. John R. Thompson Co.*,
  346 U.S. 100 (1953).....................................................................................................9

*Duff v. Keaton*,
  124 P. 291 (Okla. 1912)..............................................................................................16

*El Paso Nat. Gas Co. v. Amoco Prod. Co.*,
  Civ. A. No. 12083, 1992 WL 43925 (Del. Ch. Mar. 4, 1992).........................................10, 18

*Griffin v. Coal Co.*,
  53 S.E. 24 (W.Va. 1905)................................................................................................8

*Hartsfield v. Country Club Village Community Committee*,
  No. 13-03-713-CV, 2005 WL 913113 (Tex. App. Apr. 21, 2005).........................................32

*Inwood N. Homeowners' Ass'n, Inc. v. Harris*,
  736 S.W.2d 632 (Tex. 1987)........................................................................................24

*Jamgotchian v. State Horse Racing Comm'n*,
  269 F. Supp. 3d 604 (M.D. Pa. 2017) ............................................................................10

*In re Jenkins v. Sosebee*,
  74 B.R. 440 (N.D. Ga. 1987) .........................................................................................6

*Local Fed. Sav. & Loan. Ass'n of Okla. City v. Eckroat*,
  100 P.2d 261 (Okla. 1940).................................................................................12, 13, 25, 30

*Masgas v. Anderson*,
   310 S.W.3d 567 (Tex. App. 2010) ....................................................................14

*McCart v. Cain*,
   416 S.W.2d 463 (Tex. Civ. App. 1967) ..............................................................6

*MH New Invs., LLC v. Dep't of Transp.*,
   76 So.3d 1071 (Fla. Dist. Ct. App. 2011) ........................................................19

*Panhandle & Santa Fe Ry. Co. v. Wiggins*,
   161 S.W.2d 501 (Tex. App. 1942)...............................................................10, 18

*Reagan Nat'l Advert., Inc. v. Capital Outdoors, Inc.*,
   96 S.W.3d 490 (Tex. App. 2002)..................................................................29, 31

*In re Sabine Oil & Gas Corp.*,
   547 B.R. 66 (Bankr. S.D.N.Y. 2016) ......................................................... *passim*

*In re Sabine Oil & Gas Corp.*,
   550 B.R. 59 (Bankr. S.D.N.Y. 2016) ......................................................... *passim*

*Sharp v. Gayler*,
   737 P.2d 120 (Okla. App. 1987) ...........................................................11, 12, 13

*Smith v. Kelley*,
   56 Me. 64 (1868) ...............................................................................................23

*Tate v. Browning-Ferris, Inc.*,
   833 P.2d 1218 (Okla. 1992) ...........................................................................8, 10

*Trammell v. Fruge*,
   868 F.3d 332 (5th Cir. 2017) ..............................................................................6

*Turley v. Flag-Redfern Oil Co.*,
   782 P.2d 130 (Okla. 1989) ................................................................................18

*Wasson Interests, Ltd. v. Adams*,
   405 S.W.3d 971 (Tex. App. 2013)....................................................................4, 10

*Westland Oil Dev. Corp. v. Gulf Oil Corp.*,
   637 S.W.2d 903 (Tex. 1982)........................................................................24, 25

*Wheeler v. Schad*,
   7 Nev. 204 (1871) .............................................................................................23

*Wiggins v. Pender*,
   44 S.E. 362 (N.C. 1903)......................................................................................8

*Wimberly v. Lone Star Gas Co.*,
    818 S.W.2d 868 (Tex. App. 1991)........................................................................26, 27, 28

*Windham v. Riddle*,
    672 S.E.2d 578 (S.C. 2009) .........................................................................................17

## Statutes & Rules

11 U.S.C. § 365 ...................................................................................................................2

Fed. R. Bankr. P. 7056 ...................................................................................................1, 33

12 Okla. Stat. § 2.................................................................................................................8

52 Okla. Stat. § 802.................................................................................................11, 12, 18

60 Okla. Stat. § 50.............................................................................................................16

60 Okla. Stat. § 54.........................................................................................................20, 21

## Other Authorities

9 Powell on Real Property § 60.04 ....................................................................................23

*Dedicate*, Merriam-Webster Online Dictionary, https://perma.cc/F4TE-9X3Q ...........14

Restatement (First) of Property § 450.................................................................................20

Restatement (First) of Property § 453.............................................................................15, 16

Restatement (First) of Property § 454.........................................................................15, 16, 17

Restatement (First) of Property § 512.................................................................................20

Restatement (First) of Property § 534..................................................................................9

Stephen E. Sachs, *Originalism as A Theory of Legal Change*, 38 Harv. J. L. &
    Pub. Pol'y 817 (2015) ....................................................................................................9

Plaintiffs Alta Mesa Holdings, LP ("AMH LP") and Oklahoma Energy Acquisitions, LP ("OEA") (together, "AMH") submit this motion (the "Motion") pursuant to Fed. R. Bankr. P. 7056 for summary judgment with respect to the *First Amended Adversary Complaint for Declaratory Relief* (ECF No. 82) (the "Complaint") filed on October 25, 2019, by AMH.  AMH respectfully states as follows:

## PRELIMINARY STATEMENT

1.     Since 2015, AMH has been laboring under the yoke of one-sided agreements with its corporate sibling, Kingfisher Midstream, LLC ("KFM").  These agreements—referred to as the Gathering Agreements or the Agreements—established KFM as AMH's dominant supplier of gathering and processing services for AMH's extracted oil and gas.  The Gathering Agreements were not negotiated at arm's length.  To the contrary, AMH was controlled and run by executives with economic interests in KFM, and the contracts were "negotiated" on behalf of AMH by the very same conflicted owners and managers—indeed, a single (now former) AMH executive signed the contracts on behalf of both parties.  The contracts reflect this pervasive conflict of interest, imposing upon AMH gathering and processing fees that were and remain substantially above market.

2.     What is more, in 2016, AMH's conflicted controllers caused the company to enter into a pair of amendments that attempted to further cement its one-sided relationship with KFM. The amendments to the Gathering Agreements purported to further guarantee AMH was burdened with "covenants" to KFM that AMH cannot reject, even in bankruptcy, though now KFM insists that these amendments were non-substantive clarifications.  AMH filed this adversary proceeding disputing the legal effectiveness of that maneuver (to the extent KFM still contends it had any

effect at all), so that it may sell its assets free and clear of the Agreements' purportedly perpetual burdens.

3.     This summary judgment motion concerns one of the challenges to the Agreements raised by Plaintiffs in the adversary proceeding.  The Gathering Agreements are terminable as executory contracts under Section 365 of the Bankruptcy Code.  KFM seeks to avoid the clear application of Section 365, however, by claiming that these quintessential services contracts are actually part of AMH's real property.  More particularly, KFM contends that these contracts have been alchemized into "covenants that run with the land," such that any future owner of the AMH assets will be saddled with these terms as if they were part of the land itself.  Thus, KFM contends, the fresh-start policy manifest in Section 365 is overridden by private contract.

4.     Although the Gathering Agreements purport to covenant certain interests to KFM, these covenants do not run with the land for a host of reasons.  First, "horizontal" privity of estate is required under Oklahoma law for a covenant to run with the land, and the undisputed record shows that AMH and KFM lacked horizontal privity when the covenants were conveyed.  Second, and in any event, the covenants do not "touch and concern" AMH's or KFM's land.  They are simply contractual promises to deliver a proportion of AMH's already-extracted gas and oil— classic personal property interests, not interests in the mineral estate—to KFM.  Finally, the covenants cannot be enforced as equitable servitudes because, as simple contractual promises to deliver produced hydrocarbons, they neither burden AMH's land nor benefit KFM's land.

5.     Accordingly, for the reasons set forth in further detail below, AMH respectfully requests that the Court grant summary judgment in its favor on Count I of the Complaint.

## STATEMENT OF FACTS

6.     The below material facts, none of which KFM can reasonably dispute, establish that AMH is entitled to reject both the Crude Oil and Gas Gathering Agreements.

## I.      The Parties and Other Entities

7.      Debtor-Plaintiff AMH LP is a debtor-in-possession in the above-captioned proceedings.

8.      Debtor-Plaintiff OEA LP is a debtor-in-possession in the above-captioned bankruptcy proceedings, a wholly owned subsidiary of AMH LP and a party to the Gathering Agreements.

9.      Debtor Alta Mesa Resources ("AMR") is a publicly traded Delaware corporation that holds interests in both AMH and KFM.

10.      Defendant KFM was created in 2015 to serve as a midstream oil- and gas-gatherer for AMH.  KFM is party to the Agreements.

11.      Harlan Chappelle is the former President and CEO of AMH; Michael Ellis is the former COO of AMH; and High Mesa, Inc. ("HMI") is a privately held Delaware corporation. Prior to 2018, these parties directly and indirectly owned and controlled AMH.  They are referred to collectively as the "Controlling Owners."

## II.      The Original Gathering Agreements

12.      AMH is an onshore oil and natural gas company.  As an "upstream" company, AMH finds and produces oil and natural gas and, since 2012, has focused on mineral rights in Oklahoma's STACK formation.[2]  *See* Ex. 12.

13.      In 2015, HMI entered into an agreement with Asset Risk Management, LLC ("ARM") to form KFM, a midstream gathering and processing entity for AMH, *see* Ex. 13, and

---

[2]      STACK is an acronym derived from the Sooner Trend oil field, Anadarko basin, and Canadian and Kingfisher counties. It refers to a geographic area in the Anadarko basin area of Oklahoma.

KFM entered into an agreement with ARM to manage its operations and the construction of its gathering system.  *See* Ex. 14.

14.     Following the formation of KFM, the Controlling Owners caused AMH to enter into two gathering agreements with KFM (the "Original Agreements") on August 31, 2015.[3]  The Original Agreements provided that KFM would gather AMH's crude oil and gather and process gas produced from AMH's mineral leasehold interests (the "Interests").  They also purported to (1) dedicate a portion of AMH's production to KFM, (2) reinforce the dedication with a real covenant "running with the land," and (3) commit AMH to convey to KFM easements or rights-of-way pending certain conditions.  *See* Ex. 1 (2015 GGA); Ex. 2 (2015 COGA).

**III.     The Amended Agreements**

15.     In 2016, a bankruptcy court in the Southern District of New York entered orders rejecting gathering agreements substantively identical to the Original Agreements on the grounds that they did not constitute covenants running with the land.  *See In re Sabine Oil & Gas Corp.*, 547 B.R. 66 (Bankr. S.D.N.Y. 2016); *In re Sabine Oil & Gas Corp.*, 550 B.R. 59 (Bankr. S.D.N.Y. 2016).

16.     Concerned that the Original Agreements might suffer the same fate in bankruptcy, *see infra* note 16, the Controlling Owners caused AMH to execute amended Gathering Agreements, effective December 1, 2016.[4]  As amended, the Agreements contain additional

---

[3]     Unless otherwise noted, the term "Original Agreements" refers to the oil- and gas-gathering agreements AMH entered into with KFM on August 31, 2015.  *See* Ex. 1 (2015 GGA); Ex. 2 (2015 COGA).  The term "GGA" refers to the Gas Gathering Agreement separately, while the term "COGA" refers to the Crude Oil Gathering Agreement separately.  Unless modified by "Original," references to "GGA" and "COGA" are to the 2016 Amended Agreements.

[4]     Unless otherwise noted, the term "Gathering Agreements" refers to the amended oil- and gas-gathering agreements that became effective on December 1, 2016.  *See* Ex. 3 (2016 GGA); Ex. 4 (2016 COGA).

language and purported conveyances of real property interests meant to insulate the Agreements from rejection in bankruptcy.  The additional language and purported interests included: (1) conveyance of "Transportation Interests," or "the sole and exclusive right to transport minerals" from AMH's Interests; (2) a declaration of intent that conveyance of the Transportation Interests constituted a real property interest in AMH's Interests; and (3) a purported easement over the surface of AMH's Interests for the purpose of constructing and maintaining gathering and processing facilities.  *See* Ex. 3 (2016 GGA); Ex. 4 (2016 COGA).  KFM now takes the position that these amendments merely "clarified and ratified the conveyances previously granted in the 2015 Gathering Agreements."  Ex. 11, at 9.

## IV.   Procedural History

17.   On September 11, 2019, AMH and several related entities filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

18.   Plaintiffs initiated the adversary proceeding in this case the next day.  *See Alta Mesa Holdings, LP v. Kingfisher Midstream, LLC*, No. 19-35133.  As amended, Plaintiffs' Complaint asserted multiple counts against KFM.  This includes Count I, which seeks a declaratory judgment that the Gathering Agreements are subject to rejection under Sections 365(a) and 363(f) of the Bankruptcy Code.  This is the Count on which AMH seeks summary judgment.[5]

---

[5]   The Court can resolve this case without determining whether the Gathering Agreements create covenants that run with the land.  As detailed in AMH's *Emergency Motion for Leave to File Second Amended Complaint*, ECF No. 95, and its attachments, KFM has committed Events of Default under the Gathering Agreements by ███████████████████ ████████████████████████████████████████████ all of these actions are "steps towards" the enumerated conditions, and any such "step" triggers an Event of Default.  If the Court were to grant AMH's motion to amend the Complaint, and if the Court were to agree that any one of those actions by KFM constituted an Event of Default, then AMH would be entitled to terminate the Gathering Agreements—full stop.  Accordingly, granting AMH's motion for leave to amend and concluding that KFM has committed Events of Default would obviate any need for the Court to delve into the vagaries of Oklahoma property law.

**ARGUMENT**

19.     "Summary judgment must be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trammell v. Fruge*, 868 F.3d 332, 338 (5th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).  Plaintiffs are entitled to summary judgment because the Gathering Agreements are subject to rejection in bankruptcy as executory contracts.  That is because, on their face as a matter of law—and confirmed by undisputed record evidence—the Gathering Agreements do not create covenants that run with the land.

**I.      The Gathering Agreements Do Not Create Covenants That Run with the Land**

20.     The Gathering Agreements obligate KFM to provide certain services—namely, transportation and processing of natural gas and crude oil—to AMH.  As such, the Gathering Agreements are classic executory contracts that require ongoing performance by both sides.  This dispute centers on whether certain provisions or features of the Gathering Agreements transform them into "covenants running with the land," which would be immune from rejection under Section 365.  The Gathering Agreements do not meet that exacting standard.

21.     Two threshold matters merit brief discussion.  Neither proposition is open to debate, but both underscore the high hurdles to embracing the "covenant running with the land" exception to Section 365.  First, as the party seeking to preserve the Gathering Agreements as covenants, KFM bears the burden of proof.  *McCart v. Cain*, 416 S.W.2d 463, 465 (Tex. Civ. App. 1967).  This is no slight burden, since KFM is attempting to apply concepts of Oklahoma real property law to a services contract, with the goal of displacing Section 365 of the federal Bankruptcy Code.  Second, the parties' say-so does not suffice; "language in an instrument of conveyance or contract cannot create a covenant running with the land by merely stating that the interest conveyed is such."  *Jenkins v. Sosebee (In re Jenkins)*, 74 B.R. 440, 445 (N.D. Ga. 1987).  Accordingly, it falls

to KFM to show that the actual nature of the Gathering Agreements—not self-serving labels—meets the legal requirements.

22.    There are three such requirements under Oklahoma law: (1) "privity of estate between the party claiming the benefit and the party upon whom the burden rests"; (2) that the covenant's burden or benefit "'touch[es] and concern[s]' the land"; and (3) that "the original covenanting parties . . . intended for the burden or benefit to pass to successors." *Beattie v. State ex rel. Grand River Dam Auth.*, 41 P.3d 377, 387 (Okla. 2002) (per curiam) (Opala, J., concurring) (citation omitted).  Judgment must be entered for Plaintiffs if KFM fails to prove "any one of these elements." *Id.*

23.    On the face of the Gathering Agreements—as confirmed by the undisputed record evidence—KFM cannot meet its burden to establish at least two of these required conditions: (1) privity of estate between AMH and KFM, and (2) that the covenant "touch[es] and concern[s]" the land.

## A.    There Is No Privity of Estate Between KFM and AMH.

24.    In order for a covenant to run with the land, the parties to the covenant must be in privity.  Traditionally, privity comes in two forms: horizontal and vertical, both of which are required for a covenant to run with the land.  Horizontal privity "refers to the relationship between the original covenantor and covenantee," and "[a]s originally conceived, . . . exist[s] only if the covenantor and covenantee created the covenant in connection with a conveyance of an estate from one to the other."  *Id.*  Vertical privity "refers to the relationship between the present owner or occupier of the land and one of the original covenanting parties."  *Id.* at 387-88.

25.    Vertical privity is present because AMH and KFM are the original parties to the covenant.  But the same cannot be said of *horizontal* privity, because the covenant was not made in connection with the conveyance of a real property interest in AMH's mineral estate.

26.     KFM maintains that it can satisfy horizontal privity.  ECF No. 106, at ¶ 144.  But because it knows that its case for horizontal privity is weak, KFM claims that horizontal privity is not required for a covenant to run with the land under Oklahoma law.  *Id.*

27.     KFM is wrong.  As explained below, Oklahoma adopted the common law of real covenants in 1910, including the requirement of horizontal privity.  That requirement remains in full force today, and it is fatal to KFM's effort to transform the Gathering Agreements into covenants running with the land.

### 1. Oklahoma Law Requires Horizontal Privity of Estate for a Covenant to Run with the Land.

28.     In 1910, the Oklahoma Legislature adopted the common law by statute.  *See* 12 Okla. Stat. § 2.  The statute reads in 2019 as it did in 1910, and it provides in relevant part that "[t]he common law, as modified by constitutional and statutory law, judicial decisions and the condition and wants of the people, *shall remain in force* in aid of the general statutes of Oklahoma."  *Id.* (emphasis added).  As the Oklahoma Supreme Court has put it, "By statutory mandate *the common law remains in full force in this state, unless a statute explicitly provides to the contrary.*"  *Tate v. Browning-Ferris, Inc.*, 833 P.2d 1218, 1225 (Okla. 1992).

29.     In 1910, the common law of covenants required horizontal privity for a covenant to run with the land.[6]  No statute since enacted has provided to the contrary, let alone "explicitly."

---

[6]     *See, e.g.*, *Griffin v. Coal Co.*, 53 S.E. 24, 60 (W.Va. 1905) ("A covenant which may run with the land can do so only when there is a *subsisting privity of estate between the covenantor and the covenantee* . . . . If there is no privity of estate between the contracting parties, the assignee will not be bound by, nor have the benefit of, any covenants between the contracting parties . . . .") (citation omitted) (emphasis added); *Wiggins v. Pender*, 44 S.E. 362, 365 (N.C. 1903) ("Covenants which run with the land are those which affect the nature, quality, or value of the thing granted, where there is a *privity of estate between the contracting parties* . . . .") (citation omitted) (emphasis added); *Atlanta Consol. St. Ry. Co. v. Jackson*, 34 S.E. 184, 185 (Ga. 1899) ("In order that it [a covenant] may run with the land, . . . there must be a privity between the contracting parties.")

And no decision of the Oklahoma Supreme Court has abolished the horizontal privity requirement. *See Beattie*, 41 P.3d at 388 (Opala, J., concurring) (noting that the Oklahoma Supreme Court "has never expressly dispensed with horizontal privity as a condition for the running of a real covenant"). Thus, Oklahoma law requires that there be horizontal privity between the original parties of a covenant in order for the covenant's burden to run with the land.

30.     KFM doubtless will observe that no case by an Oklahoma court involving real covenants has squarely addressed the issue of horizontal privity. *See id.* ("[T]he vertical aspect of privity is generally the only one identified in the few Oklahoma decisions involving the running of real covenants."). But it does not follow that horizontal privity was not required in those cases. "Most of Oklahoma's privity of estate decisions arise out of a lessor-lessee relationship between the original covenanting parties." *Id.* at 388 n.25. And because such a relationship "supports horizontal privity even under the strict English common law requirement, these cases provided no opportunity for the court to undertake a systematic discussion of the current status of the horizontal privity requirement." *Id.*

31.     In any event, legal requirements do not waste away simply because they are not the subject of disputes. It is a bedrock assumption of our legal system that "the law stays the same until it's lawfully changed."[7] *Cf., e.g.*, *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 113-14 (1953) ("The failure of the executive branch to enforce a law does not result in its

---

(citation omitted); Restatement (First) of Property § 534 (1944) ("The successors in title to land respecting the use of which the owner has made a promise are not bound as promisors upon the promise *unless* the transaction of which the promise is a part *includes a transfer of an interest either in the land benefited by or in the land burdened by the performance of the promise . . . .*") (emphasis added).

[7]     Stephen E. Sachs, *Originalism as a Theory of Legal Change*, 38 Harv. J.L. & Pub. Pol'y 817, 818 (2015) ("A statute that's hundreds of years old can still be good law today, simply because it was properly enacted at some earlier time and has never been amended or repealed.").

modification or repeal."); *Jamgotchian v. State Horse Racing Comm'n*, 269 F. Supp. 3d 604, 618 n.4 (M.D. Pa. 2017) ("What of those American jurisdictions that have accepted the doctrine [of desuetude]?  Little effort is needed to canvass the relevant case law, given that West Virginia alone recognizes desuetude as a valid defense.") (citation omitted).   Under Oklahoma law, only the Oklahoma Supreme Court and the Oklahoma Legislature have the authority to abolish horizontal privity, and only by express action.   Indeed, as noted above, the Oklahoma Supreme Court has recognized that the statutory adoption of the common law intended to establish precisely that understanding: "By statutory mandate *the common law remains in full force in this state, unless a statute explicitly provides to the contrary*."  *Tate*, 833 P.2d at 1225.  Accordingly, the horizontal privity requirement remains in full force today as it was in 1910.

### 2.  KFM Cannot Meet Its Burden to Establish Horizontal Privity of Estate.

32.     In order for horizontal privity to exist such that a covenant runs with the land, "the covenantor and covenantee [must] create[] the covenant in connection with a conveyance of an estate from one to the other."  *Beattie*, 41 P.3d at 387 (Opala, J., concurring); *see also Wasson Interests, Ltd. v. Adams*, 405 S.W.3d 971, 973 (Tex. App. 2013) ("For a covenant to run with the land, the covenant must be made between parties who are in privity of estate at the time the covenant was made, and must be contained in a grant of land or in a grant of some property interest in the land.").   In addition, the covenant must be created as part of the conveyance of an interest in the *same* land burdened by the covenant.  *See, e.g.*, *El Paso Nat. Gas Co. v. Amoco Prod. Co.*, Civ. A. No. 12083, 1992 WL 43925, at *11 (Del. Ch. Mar. 4, 1992); *Panhandle & Santa Fe Ry. Co. v. Wiggins*, 161 S.W.2d 501, 505 (Tex. App. 1942).  Thus, for a covenant to run with the land,

it must be conveyed (1) simultaneously with a real property interest that is (2) part of the same estate burdened by the covenant.[8]

33.    KFM cannot establish such a conveyance because the Agreements do not convey a real property interest in the AMH's mineral estate.[9]  By statute, the bundle of sticks constituting the mineral estate are (1) the right to capture the minerals underlying a tract of real property, (2) the right of ingress and egress, and (3) the right to make reasonable use of the surface estate for the purposes of exploring, severing, capturing and producing the underlying minerals.  52 Okla. Stat. § 802.  In addition, the owner of a mineral interest "has distinct incidents of ownership with respect to future leases," including "(a) the power to lease, (b) the right to receive bonuses, (c) the right to receive delay rentals, and (d) the right to receive royalties."  *Sharp v. Gayler*, 737 P.2d 120, 122 (Okla. App. 1987) (citation omitted).  Because none of these interests was conveyed along with the Gathering Agreements, AMH and KFM were not in horizontal privity, and there is no covenant running with the land.

  i.    **The Agreements' "Transportation Interests" Are Not Interests in the Mineral Estate.**

34.    Section 3.1 of the Agreements conveys to KFM a number of rights collectively termed "Transportation Interests."  These interests consist of "the sole and exclusive right to transport minerals from the Producer's Interests and After-Acquired Interests, specifically the right

---

[8]    For example, Bill owns a parcel of land and conveys one half of it to Sally subject to the restriction that Sally cannot build a structure on the land taller than 25 feet.  This would satisfy horizontal privity because (1) the covenant was conveyed simultaneously with a property interest (the land in fee simple) and (2) the very same property was both conveyed and burdened by the covenant (the parcel of land).

[9]    AMH's mineral estate comprises its leased mineral interests.  The Agreements refer to these as AMH's "Interests," *see* GGA & COGA § 1.1, and we use the same term here.

to gather, process, stabilize, dehydrate, compress, meter, measure and store Gas and NGLs [natural gas liquids] that may be produced and saved therefrom."  GGA § 3.1; COGA § 3.1.[10]  Section 3.1 thus grants KFM the right to transport, process, and store extracted hydrocarbons from AMH's Interests.

35.     The Transportation Interests conveyed are not interests in real property for at least two reasons.  First, the conveyance concerns gas and oil after they have been extracted from the ground—*personal*, rather than *real*, property.  As the Oklahoma Supreme Court has explained, "it is uniformly held [that], once oil and gas is extracted from the earth, it becomes tangible, personal property."  *Champlin Exploration, Inc. v. W. Bridge & Steel Co., Inc.*, 597 P.2d 1215, 1218 (Okla. 1979); *see also Local Fed. Sav. & Loan. Ass'n of Okla. City v. Eckroat*, 100 P.2d 261, 262 (Okla. 1940) ("[O]il after recovery is personal property.").  The right to produce and transport *personal* property cannot be a *real* property right.

36.     Second, the right to transport and produce hydrocarbons is not one of the "sticks" traditionally recognized as part of the mineral estate in Oklahoma.  That is why the *Sabine* Court rejected the notion that the conveyance of a materially identical "transportation interest" was somehow a conveyance of real property.  *See Sabine*, 550 B.R. at 80 ("A right to transport or gather produced gas is clearly not one of these 'sticks' [of a mineral estate].").  Although *Sabine* analyzed a gas gathering agreement under Texas law, there is no material difference in this respect from Oklahoma law.  Neither recognizes the transportation of *extracted* hydrocarbons as part of the underlying mineral estate.  *See* 52 Okla. Stat. § 802; *Sharp*, 737 P.2d at 122.

---

[10]     The GGA and COGA are materially identical except to the extent that they refer to "Gas and NGLs" or "Crude Oil," respectively, as appropriate.  For the sake of brevity, we quote only the GGA and parallel cite the corresponding, materially identical COGA provision.

37.     Section 3.2 of the Agreements does not change the result.  Titled "Real Interests," that provision attempts to declare by fiat that the Transportation Interests are real property interests:

> Producer and Gatherer intend that the conveyance of the Transportation Interests be a conveyance of a portion of Producer's real property interests included in the Interests (including the interests of others whose interests are represented or controlled by Producer insofar only as Producer has the power and authority to grant Transportation Interest in the interests of such third parties). Producer and Gatherer agree that Gatherer has a determinable real property interest carved out of the Interests.

GGA § 3.2; COGA § 3.2.  But saying it is so does not make it so.  As explained above, the parties' desire to create a covenant that runs with the land is but one of three necessary elements under Oklahoma law.  State law, not private parties' intent, defines the scope of real property interests. Were it otherwise, Section 365 would be easily evaded—parties could make virtually any contract a non-rejectable real property covenant by *ipse dixit*.

## ii.     Minerals "Produced and Saved" Are Not an Interest in the Mineral Estate.

38.     In its Answer, KFM chides AMH for "flout[ing]" the body of "[w]ell-settled law [that] holds that minerals 'produced and saved' qualify as real property in Oklahoma."  ECF No. 106, at ¶ 16.  But a survey of Oklahoma law yields no such doctrine.  To the contrary, it is textbook Oklahoma law that "oil after recovery is personal property."  *Eckroat*, 100 P.2d at 262.

39.     Instead, KFM must be arguing that a *royalty interest* in minerals "produced and saved" is a real property interest.  *See Sharp*, 737 P.2d at 122 (listing "the right to receive royalties" as one of a mineral interest owner's "incidents of ownership").  This argument was made by the losing party in *Sabine* and, for the same reasons it lost there, it fails here too.

40.     Section 4.3(a) of the Agreements provides:

For the Term of this Agreement, Producer hereby dedicates to Gatherer all Gas and NGLs that may be **produced and saved** from the Interests for the purpose of gathering, processing, stabilizing, dehydrating, compressing, metering, measuring, storing and acquiring from Producer such Gas and NGLs, for delivery to Gatherer at the Receipt Point(s) all Committed Gas as and when **produced and saved** . . . .

GGA § 4.3(a); COGA § 4.3(a) (the "Dedication") (emphasis added).  This language disclaims a conveyance in a royalty interest to KFM in two ways.  First, it is a *dedication*, not a *conveyance*, which is significant because only a conveyance of a real property interest can support horizontal privity.  To convey an interest in real property, the would-be conveyer must use the language of conveyance—such as "grant" or, naturally, "convey."  *See Masgas v. Anderson*, 310 S.W.3d 567, 570 (Tex. App. 2010).  By contrast, to dedicate something—that is, "to set apart to a definite use"[11]—is not the same as to convey it.  Moreover, § 4.3(a)(i) adds significant caveats to the Dedication: "notwithstanding the Dedication, Producer, as the owner of the Gas, NGLs, and other minerals, shall continue to retain its right to [(1)] administer the Interest as it deems advisable *in its sole discretion*, including the right to rework, shut in, plug or abandon any well"; (2) "use Gas and NGLs in its operations"; and (3) "deliver Gas and NGLs that Producer is expressly required to deliver under oil and gas leases" to third parties.  In other words, despite "dedicating" all gas and NGLs from its interests to KFM, AMH retained the rights to administer the interests in "in its sole discretion," to use extracted hydrocarbons for its own operations, and to deliver the same hydrocarbons to parties other than KFM.  Even if this dedication were a conveyance, it is so riddled with reservations and caveats that it is hard to tell what, if anything, would actually be conveyed.

41.     What is more, Section 4.3 dedicates hydrocarbons "produced and saved" only for the purposes of "gathering, processing, stabilizing, dehydrating, compressing, metering,

---

[11]     *Dedicate*, Merriam-Webster Online Dictionary, https://perma.cc/F4TE-9X3Q.

measuring, storing, and acquiring."  GGA § 4.3; COGA § 4.3.  That is nothing more than a contractual promise that AMH will deliver to KFM its extracted gas for processing and transportation.  When a passenger gets into a taxicab, he does not acquire a property interest in the cab just because the driver promises to "dedicate" the cab to getting him from point A to point B. And, as in *Sabine*, there is "no allegation here that the Debtors owe . . . a royalty payment" to KFM.  *Sabine*, 550 B.R. 66.  As such, there is no colorable argument that the Dedication in § 4.3 conveys the real property interest necessary to establish horizontal privity.

**iii.    Section 4.2's So-Called Easement Is Not an Interest in the Mineral Estate.**

42.    Section 4.2 of the Agreements purports to confer an easement to KFM for the purposes of building and maintaining gas processing and delivery infrastructure.  *See* GGA § 4.2; COGA § 4.2.  But for four independent reasons, the easement does not convey a real property interest sufficient to support horizontal privity.

**a.    KFM's Easement in Gross Is Not a Real Property Interest.**

43.    "An easement is a nonpossessory right to use of the land in the possession of another for a definite and limited purpose."  *Beattie*, 41 P.3d at 385.  "An easement may be created by express grant," *id.* at 385-86, and is classified either as an easement appurtenant or an easement in gross.  An easement appurtenant arises "when the easement is created to benefit and does benefit the possessor of the land in his use of the land," Restatement (First) of Property § 453, while an easement in gross occurs when the easement "is not created to benefit or when it does not benefit the possessor of any tract of land in his use of it as such possessor,"  *id.* § 454.  Put less archaically, an easement appurtenant is an easement held by a property owner that benefits his property, such as when the owner of landlocked parcel owns an easement across the land of a neighbor to access

15

a public road.  An easement in gross, by contrast, is held by an individual irrespective of whether it benefits his property—indeed, it could be held by someone without any real property, such as an easement to access someone's property to fish in their pond.  *See* 60 Okla. Stat. § 50.

44.     Whether an easement constitutes a real property interest turns on whether it is appurtenant or in gross.  A properly vested easement appurtenant is typically a real property interest.  *See* Restatement (First) of Property § 453, cmt. c.  Whether an easement in gross constitutes a real or personal property interest depends on its duration.  As the First Restatement of Property explains:

> *Easements in gross as real or personal property.*  Depending on its period of duration, an easement in gross may be, as an interest in land, either real property or a chattel real.  Thus, if it is to endure indefinitely or for a period measured by the life of a human being, it is real property.  If its duration is measured by a definite period or periods of time, it is a chattel real.

Restatement (First) of Property § 454, cmt. b.[12]  So if the easement is an easement in gross, it must be measured by the life of a human being or be indefinite to qualify as real property.

45.     The easement held by KFM does not benefit any land owned by KFM, so it is an easement in gross.  To be sure, KFM does hold land in the STACK, including (at a minimum) the land on which its cryogenic processing plant sits.  *See* Ex. 5.  But that does not mean that the easement is appurtenant to that land.  "An easement appurtenant involves two tracts of land: the dominant tenement to which the benefit or advantage of the easement pertains and the servient tenement, which bears the burden or obligation of the easement."  *Beattie*, 41 P.3d at 385 n.8.  The Agreements are silent about any dominant estate to which the easement attaches.  To the contrary,

---

[12]     According to the Oklahoma Supreme Court, chattel real is personal property.  *See Duff v. Keaton*, 124 P. 291, 296 (Okla. 1912).

the easement is quite clear that it is "convey[ed] and assign[ed] to Gatherer," GGA & COGA §
4.2, independent of KFM's landholdings.  Thus, the easement is an easement in gross.

46.    Accordingly, the next question is whether the easement is "indefinite[] or for a
period measured by the life of a human being," or "measured by a definite period or periods of
time."  *Id.*  It is the latter.  Section 4.2(a) provides that

> *[a]t the end of the Primary Term [15 years]*, all of the Easements will revert
> automatically to Producer or the owners of such applicable rights except to the
> extent such easements and rights-of-way are necessary for owning, operating,
> repairing, replacing and maintaining any portion of the Gathering and Processing
> System used to provide service under this Agreement to the Dedicated Wells, and
> such easements and rights-of-way shall continue until the end of the Term.  At the
> end of the Term, Gatherer's easements and rights-of-way will revert automatically
> to Producer or the other applicable owners thereof.

GGA § 4.2(a); COGA § 4.2(b).  The easement thus reverts back to AMH at the end of 15 years
(the "Primary Term"), unless after that period of time the "Well(s) continue to produce Gas or
NGLs in commercial (paying) quantities (the "***Extended Term***")."   If the parties continue the
relationship beyond 15 years, the easement can remain in place only until the end of the agreement,
at which time "Gatherer's easements and rights-of-way will revert automatically to Producer or
the other applicable owners thereof."

47.    Whatever can be said about the commercial logic of this relationship, the legal
significance of it is clear: The easement is an easement in gross that is "measured by a definite
period or periods of time," Restatement First of Property § 454, cmt. b, regardless of whether the
easement lasts for the Primary Term or the Extended Term.  As such, the easement is not a real
property interest, and its conveyance cannot establish horizontal privity.  *See, e.g.*, *Windham v.
Riddle*, 672 S.E.2d 578, 583 (S.C. 2009) (noting that "[a]n easement in gross is a mere personal
privilege to use the land of another").

17

        **b.**      **The Easement Is Not a Conveyance of a Real Property Interest in AMH's Mineral Interests.**

48.     Even if the easement conveys a real property interest, it is not a real property interest in the relevant estate.  It is settled law that horizontal privity requires the conveyance of a real property interest in the same estate burdened by the covenant.  *See, e.g.*, *El Paso*, 1992 WL 43925, at *11; *Wiggins*, 161 S.W.2d at 505.  Here, the estate that is supposedly burdened by the covenant is the mineral estate.  GGA, § 4.3; OGA, § 4.3.  But the easement purports to burden only the surface estate.  By its express terms, the easement conveys "an exclusive easement and right-of-way in and to the *surface* of the Interests."  GGA § 4.2 (emphasis added); OGA § 4.2 (emphasis added).  Under Oklahoma law, the surface and mineral estates are two separate estates in real property.  *See* 52 Okla. Stat. § 802 (defining "surface estate" as "the fee simple or absolute fee ownership of a tract of real property . . . *less and excluding the mineral estate*.") (emphasis added); *Turley v. Flag-Redfern Oil Co.*, 782 P.2d 130, 135 (Okla. 1989) (analyzing the surface and mineral estates as two separate estates).[13]  Conveyance of an easement over the surface estate to perform specific functions is not a conveyance of a real property interest in the underlying mineral estate.  Accordingly, the easement and purported covenant do not relate to the same estate, so the easement—even if it were a real property interest—could support only a covenant running with the surface estate, not the mineral estate.

49.     The *Sabine* Court held as much when faced with materially identical facts.  In *Sabine*, the producer granted one of the gatherers a "pipeline easement," or an easement to

---

[13]     This was the understanding of key AMH executives at the time of the 2016 Amendment.  *See* Ex. 6 at 84 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); Ex. 7 at 237 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛).

construct a 90-foot pipeline over the surface estate under which the producer's mineral interests lay. 550 B.R. at 63. The producer also granted a tract of land to the gatherer to construct a gathering facility. *Id.* The gatherer later argued that the two conveyances—the tract and the easement—satisfied horizontal privity, but the Court disagreed:

> [T]hese facts do not fit within the traditional paradigm for horizontal privity of estate between covenanting parties . . . . As the Debtors argue in the SJ Motion, the model for the creation of horizontal privity of estate is the conveyance of an interest in property *that itself is being burdened with the relevant covenant*, not the conveyance of an interest in property that is distinct from (even if somewhat related to) the property burdened by the covenant.

*Id.* at 68-69 (emphasis added). The same is true here. Oklahoma law, like Texas law, distinguishes between the surface and mineral estates. And Oklahoma law, like Texas law, requires horizontal privity, and with it the requirement that the covenant burden the same land that the real property interest relates to. Neither the Agreements here nor the agreements in *Sabine* properly aligned the covenants' and easements' respective estates, so the same result should obtain here.

### c.    KFM's Purported Easement Is a License.

50.    In any event, properly understood, the revocable and conditional grant of access AMH gave KFM in the Agreements is not an easement at all. It is a mere license, and a license is not a real property interest. *See, e.g.*, *MH New Invs., LLC v. Dep't of Transp.*, 76 So.3d 1071, 1072 (Fla. Dist. Ct. App. 2011) ("[A] license to use real property is a privilege to use, not an interest in real property . . . .").

51.    At common law, a license is distinct from an easement in a critical respect: a license is revocable at will. The common law definition of a license is:

> an interest in land in the possession of another which
>
> > (a) entitles the owner of the interest to a use of the land, and
> > (b) arises from the consent of the one whose interest in the land used is affected thereby, and

(c) is not incident to an estate in the land, and

(d) is not an easement.

Restatement (First) of Property § 512.

52.     Here, the grant of access clearly satisfies conditions (a) through (c): KFM is entitled to use the land for certain purposes; it can do so only by AMH's consent; and the purported easement is not incident to KFM's estate in the land.  Condition (d) is satisfied, because the grant of access does not qualify as an easement under the common law definition.

53.     An easement cannot be "subject to the will of the possessor of the land." Restatement (First) of Property § 450.[14]  The purported easement is clearly revocable at will. Under Oklahoma law, the extent of a servitude (including an express easement) is determined by its terms.  60 Okla. Stat. § 54.  By its express terms, the easement is valid only "[t]o the extent that . . . Gatherer's activities on the relevant lands do not unreasonably interfere with Producer's operations."  GGA § 4.2; COGA § 4.2.  So at the point that AMH deems KFM's activities to "unreasonably interfere" with its operations—a condition that AMH is uniquely positioned to assess—the easement is revocable.  That makes it a license, not an easement.

---

[14]     An easement is an interest in land in the possession of another which

(a) entitles the owner of such interest to a limited use or enjoyment of the land in which the interest exists;

(b) entitles him to protection as against third persons from interference in such use or enjoyment;

(c) is not subject to the will of the possessor of the land;

(d) is not a normal incident of the possession of any land possessed by the owner of the interest, and

(e) is capable of creation by conveyance.

Restatement (First) of Property § 450.

54.     Moreover, the purported easement bears a striking similarity to a commitment AMH made in the Original Agreements.  In the Original Agreements, AMH promised, "where reasonably requested by [KFM]," to convey "any easements or rights-of-way" KFM needed to construct and maintain its gathering and processing infrastructure.  Original GGA § 3.2; Original COGA § 3.2.  This promise was subject to a host of caveats, namely: (1) that the easement must be made "in compliance with all applicable agreements"; (2) that KFM's activities did not "unreasonably interfere" with AMH's operations; and (3) that the easement could be granted without AMH's "payment of monies."  *Id.*  At the time, these reservations made sense—AMH was offering a "best efforts" type of commitment that it would grant an easement, but it did not want to do so if the easement violated other agreements, complicated its operations, or subtracted from its bottom line.

55.     Fast-forward to 2016.  The *Sabine* decision had just come down, and the Controlling Owners at AMH and KFM were looking for a way to insulate the Agreements from rejection in bankruptcy.[15]  They attempted to do this, in part, by adding the conclusory (and legally insufficient) "Transportation Interests" label discussed above.  *See* Section I.A.2.i.  They also attempted to take what had been merely a best-efforts, caveat-laden promise to *try to grant* an easement and turn it into an actual easement.  But—still wanting the wiggle-room of the former promise—the executives *kept the many caveats from the former commitment*.  In fact, the new "easement" added *further caveats*—namely, that the right would be non-exclusive to the extent AMH needed access to the land or the easement conflicted with easements given to Mustang Fuel Corporation.  GGA § 4.2; COGA § 4.2.

---

[15]     *See, e.g.*, Ex. 8; Ex. 9; Ex. 10.

56.     What we are left with is a purported easement that conveys virtually nothing.  A reader of Section 4.2 has no idea whether the purported easement would (1) conflict with AMH's other agreements, (2) interfere with AMH's operations, or (3) cost AMH money.  For example, if after granting the purported easement the parties had determined that executing it would require some expenditure that neither was willing to bear, the easement would cease to exist.  This is equally true of the caveats imported from the easement promise in the Original Agreements, as well as the other caveats added by the easement in the amended Agreements.  Such a precarious interest in AMH's leased lands cannot possibly be an easement under common law.  It is therefore a mere license and not a real property right at all.

57.     In point of fact, KFM maintains that the 2016 amendments to the Original Agreements were mere clarifications.  *See* Ex. 11, at 9.  That is, KFM disclaims the idea that the 2016 amendments added a new easement; they simply "clarified" AMH's promise to grant easements "where reasonably requested by [KFM]."  Original GGA § 3.2; Original COGA § 3.2.  This admission by KFM is further evidence that whatever § 4.2 of the Agreements conveys, it is not an easement but rather a contractual commitment to convey an easement "where reasonably requested" at a later date.  Such a promise is not a real property interest and, therefore, cannot establish horizontal privity.

### d.     The Easement Was Not Conveyed at the Same Time as the Covenant.

58.     Even if the Agreements granted a true easement (rather than a license), and even if the easement were a real property interest (despite being in gross), and even if it related to the mineral estate (it does not), the easement still would not establish horizontal privity.  That is because the easement was not conveyed simultaneously with the purported covenant, which is required in order to create horizontal privity.  *See* 9 Powell on Real Property § 60.04(3)(c)(iii)

(noting that, to establish horizontal privity, "[t]he covenant and the conveyance must be made at the same time."); *Wheeler v. Schad*, 7 Nev. 204, 208 (1871) ("Unless they constituted one instrument or transaction, it cannot be claimed that the covenants of the agreement run with the land so as to charge the grantee of the covenantor."); *Smith v. Kelley*, 56 Me. 64, 69 (1868) (holding that promise was not a "covenant running with the land" because "[i]t [was] not a part of the deed, and [was] not referred to in it" but instead "was made subsequently").

59.     As described above, the Original Agreements promised that AMH would grant KFM an easement, at some time in the future, and pending resolution of a number of conditions. The same document provided that "this Agreement shall be a covenant running with the land and the Interests and any After-Acquired Interests."  Original GGA, § 3.4; Original COGA, § 3.4.  In other words, AMH made the same promise in the Original Agreements (*i.e.*, to dedicate to KFM all oil and gas produced from its Interests for gathering) that it later would make in the amended Agreements.  In fact, KFM has taken the position that the covenant conveyed in the Original Agreements is the *same* covenant that appears in the amended Agreements.  *See* Ex. 11, at 9.  But, unlike the Original Agreements, the amended Agreements also contain the purported easement—an ostensible and deliberate change from what was previously only a contractual promise to grant an easement under certain circumstances.  *See* Section I.A.2.iii.c.  The amended Agreements, therefore, contain the same covenant as the Original Agreements but a new (purported) real property interest in the form of the easement.

60.     Stated differently, the Original Agreements contained (1) the purported covenant and (2) a promise to make an easement under certain conditions.  The amended Agreements contain (1) the *same* purported covenant and (2) a new, ostensibly different easement.  If KFM is correct that the new easement is, in fact, an easement, the parties were only in privity of estate

when it—and not the original easement promise—was conveyed. And that was *after* the covenant had been conveyed.

61.    Under hornbook property law, even if the purported easement is a valid easement, AMH and KFM were in horizontal privity only *after* the covenant was conveyed. Thus, the conveyance of the easement cannot establish horizontal privity.

### B.    The Covenant Does Not Touch and Concern the Land.

62.    In addition to horizontal privity, Oklahoma law requires that a covenant "touch and concern" the burdened estate in order for it to run with the land. KFM must show that there is "a logical connection between the benefit to be derived from enforcement of the covenant and the property." *Beattie*, 41 P.3d at 388. But KFM can only show a connection between the covenant and *personal*, not *real*, property; it cannot escape the fact that the covenant has nothing to do with land and everything to do with extracted oil and gas.

63.    There are two generally recognized tests to determine whether a covenant touches and concerns the land. *See Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 911 (Tex. 1982).[16] The first requires that the covenant "affect[] the nature, quality, or a value of the thing demised, independently of collateral circumstances," *id.* (citation omitted); the second requires that "the promisor's [AMH's] legal relations *in respect to the land in question* are lessened . . . and

---

[16]    The Oklahoma Supreme Court has never "explicate[d] the meaning of the phrase [touch and concern] other than to suggest generally that to meet this requirement, the covenant must relate to the land." *Beattie*, 41 P.3d at 389 (citation omitted). Given the general similarities between the states' laws on this subject, the Court should look to Texas's thoroughly developed case law on the subject in addition to common law principles Oklahoma adopted in 1910. *Cf. Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987) (explaining that Texas law, like Oklahoma law, requires that a covenant satisfy horizontal privity and touch and concern the land in order to run with it).

the promisee's [KFM's] legal relations *in respect to that land* are increased," *id.* (emphasis added) (citation omitted).  The undisputed record shows that KFM can satisfy neither of these tests.

### 1. The Covenant "Affects" Only Extracted Oil and Gas, *Not* the Land from which They Are Extracted.

64.     Under Oklahoma law, once minerals are extracted from the ground, they cease to be real property and instead become personal property.  *Champlin Exploration*, 597 P.2d at 1218 ("[O]nce oil and gas is extracted from the earth, it becomes tangible, personal property . . . ."); *Eckroat*, 100 P.2d at 262 ("[O]il after recovery is personal property.").  The covenant adopts the Agreements' Dedication, which "dedicates to [KFM] all Gas and NGLs that may be produced and saved from the Interests."  GGA § 4.3; COGA § 4.3.  Although the "Interests" referred to in § 4.3 are real property, the subject of the purported covenant ("Gas and NGLs" extracted from the Interests) is personal property.  And this makes perfect sense: KFM's role in this arrangement is not to deal with the land—that is AMH's job.  KFM's role is to transport and process AMH's gas, NGLs, and crude oil once they have been extracted.  Accordingly, the covenant does not "touch and concern" the land in any real way; it concerns products taken from the land, but only after they have been taken.

65.     The *Sabine* Court reached the same conclusion, but on facts that were even stronger for the gathering party.  As here, the "dedication covenants" in *Sabine* provided Sabine's gatherers "the products needed to perform the contracted-for services."  *Sabine*, 550 B.R. at 81.  But the covenants in *Sabine* went a significant step further: in addition to covenanting the dedication of extracted hydrocarbons, one of the covenants dedicated the leases of the lands from which the hydrocarbons were extracted—the equivalent of dedicating not just AMH's produced oil and gas, but also AMH's Interests.  *Id.* at 74.  But despite the dedication of leases—textbook interests in real property—the *Sabine* Court concluded that the covenants there did not "touch and concern"

the land because the lease "dedication [was] in furtherance of the overarching purpose of the contract, which is to provide product services to the Debtors." *Id.* at 81.

66.     Here, by contrast, the only thing covenanted to KFM are the extracted hydrocarbons, not leases of the Interests.   Providing services to AMH is not simply the "overarching" purpose of the Agreements—it is literally their *only* purpose.

### 2. The Covenant Does Not Affect the Value of or Lessen AMH's Legal Relations to Its Leased Lands.

67.     Because the covenant concerns only the products of AMH's leased Interests and not the Interests themselves, it neither affects the Interests' value nor lessens AMH's legal relations to the Interests.

68.     The analysis might be different if the covenant contained a properly executed acreage dedication.  In a real acreage dedication, the producer promises not merely that it might deliver gas or oil from specific acreage—as AMH does here—but instead encumbers its mineral interests by promising to *in fact* deliver products from specific acreage.  For example, a covenant to provide water from specified acreage unless the covenantor decides otherwise does not actually cause water to be drilled from the land—it is a "dedication" in name only, because the covenantor retains the right not to provide the resource at all.  But a covenant to actually provide water from specified wells could touch and concern the land on which those wells sit because it requires action to be taken upon the land.  *Cf. Wimberly v. Lone Star Gas Co.*, 818 S.W.2d 868, 871 (Tex. App. 1991).

69.     Although the agreements nominally dedicate "all Gas and NGLs that may be produced and saved from the Interests," GGA & COGA § 4.3, the Dedication goes on to list four caveats that make clear that it dedicates little, if anything from the land:

> [N]otwithstanding the Dedication, [AMH], as the owner of the Gas, NGLs, and other minerals, shall continue to retain its right to (i) administer the Interests as it deems advisable

> **in its sole discretion**, including the right to rework, shut in, plug or abandon any well, (ii) form or participate in the formation of any unit, (iii) use Gas and NGLs in its operations, and (iv) deliver Gas and NGLs that Producer is expressly required to deliver under [prior] oil and gas leases . . . .

GGA § 4.3 (emphasis added); COGA § 4.3 (emphasis added).   AMH thus reserves complete control over whether KFM gets *any* hydrocarbons at all from the supposedly dedicated acreage. Specifically, AMH: (1) is not required to produce any gas at all, administering the Interests "in its sole discretion";[17] (2) can use all of the hydrocarbons for its own operations, including if it decided to build its own gathering infrastructure; and (3) can deliver a limited proportion of its production to other gatherers.   That is no "dedication" at all.

70.   The Dedication goes on to list an *additional* four caveats.[18]   Specifically, KFM is to receive AMH's oil and gas, unless that conflicts with a prior dedication in favor of Mustang Corporation or a party entitled to receive oil and gas from AMH's after-acquired interests.   *Id.* Moreover, AMH reserves its right to deliver oil and gas to other parties as may be required under

---

[17]   This was the understanding of key executives at AMH, including CEO Hal Chappelle and Vice President Mike Ellis.  *See* Ex. 6 at 72 ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████  Ex. 7 at 223-24 (██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████).

[18]   The remainder of § 4.3(a) provides that:

> [T]he Dedication is subject to (w) any valid and enforceable prior written dedication in favor of Mustang under the Mustang Agreement, (x) with respect to any After-Acquired Interests within the Dedicated Area, any valid and enforceable prior written dedication or commitment for gathering processing or sale of Gas, NGLs, and minerals as of the time of the acquisition by Producer, (y) Producer's right to transfer Gas and NGLs produced from the Interests that Producer is expressly required to deliver under the oil and gas leasehold interests and other mineral interests comprising the Interests and (z) with respect to the Other Interests, the rights of the owners of such Other Interests, to take in-kind and separately dispose of their share of Gas and NGLs produced from the Other Interests.

GGA § 4.3(a); COGA § 4.3(a).

its mineral leases, and it reserves the rights of the owners of certain leasehold interests to "take in-kind and separately dispose of their share" of oil and gas produced from certain Interests.  *Id.* These four caveats—in addition to the four explained above—serve as further evidence that, whatever KFM gets under the Dedication, it is not an ironclad interest in the mineral estate.  It is instead a promise that AMH will deliver oil and gas to KFM unless, for a host of reasons, it decides not to.

71.     *Sabine* again provides a helpful contrast.  The Court there held that the covenants did not touch and concern the land even though the covenants dedicated leases in the producer's interests.  550 B.R. at 81.  As the Court reasoned, the dedication covenants were merely in service of the contracts' overall goal: to supply gathering services to the producer.

> The dedication covenants provide Nordheim and HPIP, as Sabine's service-providers, with the products needed to perform the contracted-for services. This is true even for the Debtors' dedication of certain leases in the HPIP Agreements inasmuch as that dedication is in furtherance of the overarching purpose of the contract, which is to provide product services to the Debtors. . . . [S]uch covenants do not have a direct impact upon the real property from which those products were produced and thus do not "touch and concern" the land.

*Id.*  What was true of those contracts is true of the Agreements.  Though the covenant incorporates an attempted acreage dedication, it is merely in service of the Agreements' broader goal: to provide AMH gathering services for its extracted oil and gas.  Thus, the covenant does not "touch and concern" the land because its primary purpose is to facilitate the gathering and processing of AMH's personal property.  *See infra* Section II.A.

72.     This conclusion is further underscored by the recent decision in *In re Badlands Energy, Inc.*, No. 17-01429-KHT, 2019 WL 5549463 (Bankr. D. Colo. Sept. 30, 2019).   In *Badlands*, Badlands Energy (the producer) entered into a gas-gathering agreement with Monarch Midstream (the gatherer).  *Id.* at *3.  When Badlands attempted to repudiate the agreement in

connection with a sale under 363(f) of the Bankruptcy Code, Monarch argued that the agreement was a covenant running with the land and, as such, could not be rejected as executory. *Id.* To satisfy the touch-and-concern requirement, Monarch pointed to the agreement's "Dedicated Reserves" section, which dedicated to Monarch "all Gas reserves *in and under*, and all Gas owned by Producer and produced or delivered from [Badland's] Leases." *Id.* at *5. Unlike the dedication in *Sabine*—which merely dedicated "all gas and condensate produced and saved . . . from wells . . . located within the Dedicated Area," *id.* at *9 (alteration omitted)—the dedication in *Badlands* "include[d] non-extracted minerals." *Id.* at *10. It therefore "encompass[ed] real property." *Id.*

73.     The parallels between the *Sabine* dedication and the Dedication here are striking. Rather than dedicate to KFM all Gas and NGLs "in and under" AMH's Interests—as the dedication in *Badlands* did—the Dedication here refers to "all Gas and NGLs *that may be produced and saved* from the Interests." GGA § 4.3 (emphasis added); COGA § 4.3. The dedication makes no reference to minerals "*in and under*" the Interests, as the dedication in *Badlands* did, but refers only to minerals "produced and saved" from the Interests. Thus, like the dedication in *Sabine* and unlike the dedication in *Badlands*, the Dedication here at most conveys an interest in AMH's produced, personal property, not an interest in any part of the underlying mineral estate.

## II.     The Covenants Are Not Enforceable as Equitable Servitudes

74.     Because KFM cannot establish horizontal privity, it might argue that the covenant is enforceable as an equitable servitude. This, too, would be error. Under the common law, a covenant that does not run with the land may still be enforced as an equitable servitude if "(1) the successor to the burdened land took its interest with notice of the restriction;  (2) the covenant limits the use of the burdened land; and (3) the covenant benefits the land of the party seeking to enforce it." *Reagan Nat'l Advert., Inc. v. Capital Outdoors, Inc.*, 96 S.W.3d 490, 495 (Tex. App.

2002) (citation omitted).[19]  The first condition is irrelevant because AMH and KFM are the original parties to the covenant.  But the second two are required, and KFM cannot possibly satisfy either.

### A.     The Covenant Does Not Limit the Use of the Land.

75.    KFM cannot satisfy the first element required for an equitable servitude because the covenant does not limit the use of AMH's Interests.  As explained above, *see* Section I.A.2.iii.b., the covenant dedicates to KFM "Gas and NGLs" extracted from the Interests.  These are personal property under Oklahoma law, not interests in the mineral estate.  *See Champlin Exploration,* 597 P.2d at 1218 ("It is uniformly held [that], once oil and gas is extracted from the earth, it becomes tangible, personal property . . . ."); *Eckroat*, 100 P.2d at 262 ("[O]il after recovery is personal property.")  And at the point they are transferred to KFM, the oil and gas are completely separated—physically and legally—from the underlying mineral estate.  Thus, the covenant concerns only personal property, not an any real property interest in the mineral estate.

76.    The covenant's attempted acreage dedication similarly does not limit AMH's use of the Interests.  For the reasons explained above, *see* Section I.B.2., the acreage dedication dedicates little, if anything, to KFM.  Among its manifold reservations and caveats, AMH is free "in its sole discretion" to completely shut off KFM's access to its oil and gas.  GGA § 4.3; COGA § 4.3.  Because AMH has the unfettered right to cut KFM off from whatever connection to the land it might have under the covenant, the covenant's purported acreage dedication does not limit the use of land.

77.    Even if the covenant gave KFM a right to gather and produce all of the gas and oil in AMH's Interests, it still would not create an equitable servitude.  Under analogous facts, the

---

[19]    As with the touch-and-concern requirement, Oklahoma law on equitable servitudes is scant.  The Plaintiffs again propose that the Court look to Texas's articulation of the common law on this issue.

Texas Supreme Court rejected the argument that an exclusive contract for water and sewer services created an equitable servitude. *Clear Lake Water Authority v. Clear Lake Utilities Co.*, 549 S.W.2d 385, 388 (Tex. 1977). In *Clear Lake*, a utility company argued that a contract making it the exclusive provider of water and sewer services to a development corporation constituted an equitable servitude such that it was binding on successive owners of the development corporation's property. *See id.* at 387-88. The Texas Supreme Court rejected this argument because the "doctrine [of equitable servitudes] has application only to promises *respecting the use of land*." *Id.* at 388 (emphasis added). And the service contract at most limited the development corporation's freedom of contract, not the use of its land:

> Enforcement of the exclusive service provision would not have restricted [development corporation] in the use of its real property; whatever the use of the land, [development corporation's] right under the contract to take or refuse water would have remained unimpaired. At most [development corporation's] promise limited [its] freedom to contract with other suppliers of water and sewer service. Such a limitation **affects the use of land only collaterally** and will not create an equitable servitude upon the land.

*Id.* (emphasis added). As in *Clear Lake*, the aim of the purported covenant is to make KFM the exclusive provider of services—to dedicate to KFM "all Gas and NGLs" produced from the Interests for gathering and processing. Whatever effect it has on AMH's Interests is a collateral consequence of what is, at base, a contract for services.

### B.   The Covenant Benefits KFM Personally, Not in Relation to KFM's Land.

78.   Moreover, KFM cannot show that the covenant is enforceable as an equitable servitude because it does not "benefit[] the land of the party seeking to enforce it." *Reagan Nat'l Advert.*, 96 S.W.3d at 495. Like the benefits KFM receives from the purported easement, the benefits KFM receives from the covenant do not benefit any land held by KFM. This is clear from the fact that the right to "all Gas and NGLs" from AMH's Interests is held by KFM as an entity,

not in relation to a parcel of land conveyed to KFM in the Agreements.  It is a contractual right to gather and process all of AMH's gas and oil, and nothing more.  Because the covenant benefits KFM as an entity and not in relation to land, the benefit is held in gross and cannot be enforced as an equitable servitude.

79.     To understand just how far afield the covenant is from a typical equitable servitude, consider a paradigmatic case.  In *Hartsfield v. Country Club Village Community Committee*, a grantor conveyed a piece of his property with a deed restriction prohibiting use of the land as a used-car business.  No. 13-03-713-CV, 2005 WL 913113, at *1 (Tex. App. Apr. 21, 2005).  The grantor then conveyed an adjacent parcel to a residential subdivision.  *Id.*  When the purchaser of the first parcel leased it to a used-car business, the subdivisions' homeowners' association filed suit for violation of the deed restriction.  *Id.*  Because there was no privity between the owners of the two conveyed parcels, the deed restriction did not run with the land as a covenant.  *See id.* at *3.  But it did serve as an equitable servitude because, among other things, it (1) clearly burdened the use of the land (prohibiting a used-car business) and (2) benefited members of the homeowners' association in relation to their land.  *Id.*

80.     On those two elements—required elements for the covenant to be enforceable as an equitable servitude—this case could not be more different.  The covenant does not burden AMH's Interests directly; it simply burdens its ability to transfer oil and gas to other gatherers, and it does a lousy job at that.  It has nothing to do with any KFM landholding; it is simply a right, held by KFM in gross, to gather and process oil and gas—if, that is, AMH decides to allow it.  Because the covenant satisfies neither of these conditions, KFM cannot possibly carry its burden to show that the covenant is enforceable as an equitable servitude.

## CONCLUSION

81.     For the reasons set forth above, AMH respectfully requests that the Court enter an

order granting summary judgment on Counts I of the Complaint pursuant to Rule 7056 and

declare that the Gathering Agreements do not create covenants that run with the land under

Oklahoma law.

Dated: November 8, 2019                              Respectfully submitted,


                                        /s/  *James G Munisteri*
                                        **FOLEY GARDERE**
                                        **Foley & Lardner LLP**

                                        James G. Munisteri
                                        TX Bar No. 14667380
                                        jmunisteri@foley.com
                                        713-276-5752 (Telephone)
                                        713-276-6752 (Facsimile)
                                        Michael K. Riordan
                                        TX Bar No. 24070502
                                        mriordan@foley.com
                                        1000 Louisiana, Suite 2000
                                        Houston, Texas 77002-5011
                                        713-276-5178 (Telephone)
                                        713-276-6178 (Facsimile)

                                        **ROBBINS, RUSSELL, ENGLERT, ORSECK,**
                                        **UNTEREINER & SAUBER LLP**

                                        Lawrence S. Robbins (*pro hac vice*)
                                        D.C. Bar No. 420260
                                        lrobbins@robbinsrussell.com
                                        Mark T. Stancil (*pro hac vice*)
                                        mstancil@robbinsrussell.com
                                        D.C. Bar No. 479012
                                        William J. Trunk (*pro hac vice*)
                                        wtrunk@robbinsrussell.com
                                        D.C. Bar No. 1003673
                                        2000 K St. NW, 4th Floor
                                        Washington, D.C. 20006
                                        202-775-4500 (Telephone)
                                        202-775-4510 (Facsimile)

                                        *Counsel for Plaintiffs Alta Mesa*

*Holdings, LP, and Oklahoma Energy
Acquisitions, LP*

## CERTIFICATE OF SERVICE

I do hereby certify that on November 8, 2019 a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this case.


/s/*Michael K. Riordan*
Michael K. Riordan