

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
12/20/2019

| | | |
|---|---|---|
| IN RE: | § | |
| **ALTA MESA RESOURCES, INC.,** *et al,* | § | **CASE NO: 19-35133** |
| Debtors | § | |
| | § | **CHAPTER  11** |
| | § | |
| **ALTA MESA HOLDINGS, LP,** *et al,* | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 19-03609** |
| | § | |
| **KINGFISHER MIDSTREAM, LLC,** *et al,* | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION</u>

Alta Mesa Holdings, LP contracted with Kingfisher Midstream, LLC to transport Alta Mesa's oil and gas over gathering systems to be constructed by Kingfisher.   Because Kingfisher's rights under the gathering agreements "run with the land," the gathering agreements between Alta Mesa and Kingfisher are not subject to rejection under section 365 of the Bankruptcy Code.  Summary judgment on the issue of rejection is granted to Kingfisher.

### Summary of Decision

Alta Mesa Holdings, LP and Oklahoma Energy Acquisitions, LP (collectively "Alta Mesa"), the debtors and plaintiffs, are Texas limited partnerships doing business in Oklahoma. Alta Mesa is an upstream oil and gas producer whose business model involves locating, extracting, and selling hydrocarbons.  Kingfisher Midstream, LLC ("Kingfisher"), the defendant, develops pipeline systems to transport extracted hydrocarbons.   Pursuant to original and amended gathering agreements, Kingfisher built a gathering system linking Alta Mesa's wells to central collection points.  In exchange, Alta Mesa promised to deliver all of its hydrocarbons, up

to certain thresholds, to Kingfisher for fixed gathering fees.  Because the fixed fees proved expensive, Alta Mesa filed this adversary proceeding to invalidate the gathering agreements.

This memorandum opinion primarily focuses on Count I of Alta Mesa's complaint.  In that count, Alta Mesa seeks a declaration that the gathering agreements are executory contracts subject to rejection under section 365 of the Bankruptcy Code.  The answer depends on whether the agreements formed real property covenants running with the land.  Under Oklahoma law, the gathering agreements did form real property covenants because they touch and concern Alta Mesa's leasehold interests, Alta Mesa and Kingfisher are in privity of estate, and Alta Mesa and Kingfisher intended that the gathering agreements bind successors.  Because real property covenants are not executory and cannot be rejected under the Bankruptcy Code, Kingfisher is entitled to summary judgment on Count I.

Other relief is also sought by summary judgment.  For the reasons set forth below, no other summary judgment relief is granted.

### Background

Alta Mesa and Kingfisher are commonly owned.  Alta Mesa alleges that its controlling owners abused the common ownership structure by agreeing to pay excessive gathering fees to Kingfisher.  Kingfisher counters that the fees are fair in light of the expense of building a modern gathering system.

The Alta Mesa plaintiffs are Alta Mesa Holdings, LP ("AMH"), and its wholly owned subsidiary Oklahoma Energy Acquisitions, LP ("OEA"). Alta Mesa is an onshore oil and gas developer.   Alta Mesa holds several oil and gas leases in the Oklahoma STACK formation.[1] Through its leasehold interests, Alta Mesa produces oil and natural gas.

---

[1] "STACK is an acronym derived from the Sooner Trend oil field, Anadarko basin, and Canadian and Kingfisher counties.  It refers to a geographic area in the Anadarko basin area of Oklahoma."  (ECF No. 108 at 3).

Alta Mesa's former CEO Harlan Chappelle, its former COO Michael Ellis, and High Mesa, Inc. ("HMI"), a Delaware corporation, owned over 99.5% of the AMH partnership interests.  (ECF No. 107 at 3).  Another individual, Dale Hayes, owned the remaining portion of AMH.  (ECF No. 131 Ex. 27 at 56).

When Alta Mesa produces oil and natural gas, it must transport its product from wellheads to market.  One common means of transportation is a gathering system.  In 2015, Alta Mesa determined that it would benefit from a modernized gathering system.  (ECF No. 110 at 17).  At that time, HMI entered an agreement with Asset Risk Management, LLC ("ARM") to form Kingfisher.  (ECF No. 108 at 4).  HMI and ARM formed Kingfisher for the purpose of constructing and operating Alta Mesa's new gathering system.  (ECF No. 108 at 4).  Alta Mesa contracted to deliver its oil and gas to receipt points where Kingfisher would then transport the delivered product to market.  The intent of the parties was to build a gathering system of pipelines from the initial receipt points to market delivery points.

On August 31, 2015, OEA and Kingfisher entered into two original gathering agreements.  (ECF No. 108 at 4).  The first, the Gas Gathering Agreement, dedicated Alta Mesa's natural gas production to Kingfisher in exchange for Kingfisher's obligation to deliver the gas to market.  It was always intended that the gas would be delivered primarily through the new gathering system.  (ECF No. 110 at 24).  The second, the Crude Oil Gathering Agreement, dedicated Alta Mesa's produced oil to Kingfisher for the same consideration.  (ECF No. 110 at 23).  The two agreements are materially identical to one another.  On December 1, 2016, OEA and Kingfisher amended both the gas and crude oil gathering agreements to include additional interests in furtherance of the construction and operation of the gathering system.  (ECF No. 108 at 4).

The original gathering agreements included multiple provisions that are relevant to the Court's inquiry.  In Section 3.2, Alta Mesa pledged to convey or assign to Kingfisher "any easement or rights-of-way for purposes of constructing, owning, operating, repairing, replacing and maintaining any portion of the [] Gathering System."  (ECF No. 107 Ex. 2 at 12).

Section 3.3 dedicates to Kingfisher "all Interests within the Dedicated Area" and required Alta Mesa to "deliver to [Kingfisher] all Committed [oil and gas] produced."  (ECF No. 107 Ex. 2 at 12).  "Interests" are defined as "[Alta Mesa's] Interests, After-Acquired Interests and Other Interests."  (ECF No. 107 Ex. 2 at 9).  Schedule 3.3 of the agreements contains a map which sets out the "Dedicated Area."  (ECF No. 107 Ex. 2 at 8, 31).  Section 4.1 required Alta Mesa to deliver all committed oil and gas to certain receipt points.  (ECF No. 107 Ex. 2 at 16).  The agreements also carved out of the dedication any oil and gas used in Alta Mesa's operations.  (ECF No. 107 Ex. 2 at 13).

Section 3.4 declares that the agreements are "covenants running with the land," and requires the parties to record the agreements.  (ECF No. 107 Ex. 2 at 13).  Section 3.4 also required the parties to "cause all transferees to execute a written instrument in a form reasonably satisfactory to [Alta Mesa or Kingfisher] acknowledging the Dedication and such transferees' obligations under this Agreement."  (ECF No. 107 Ex. 2 at 13).

The agreements also set out the fixed gathering fees, as well as the volume of committed hydrocarbons.  The agreements do not contain minimum volume provisions.

The 2016 amended agreements modified the originals in two important ways.  First, the amendments adjusted the gathering fees.  Although the parties dispute whether the effect was to save Alta Mesa funds, there is no serious question that the adjusted fees saved Alta Mesa money in the short term; the dispute concerns whether the amendments imposed additional long term

costs that offset the short term savings.  (ECF No. 110 at 30-31).  Second, the amendments added a "Conveyance of Transportation Right," which the parties intended to "be a conveyance of a portion of [Alta Mesa's] real property interests."  (ECF No. 110 at 31).  The Transportation Right was "the sole and exclusive right to transport [oil and gas] produced from the Producer's Interests and After-Acquired Interests, specifically the right to gather, separate, meter, measure, and store such [oil and gas] that may be produced and saved therefrom."  (ECF No. 107 Ex. 4 at 12-13).

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).  This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A) because rejection is a substantive right created by the Bankruptcy Code.  A declaratory judgment to determine whether contracts may be rejected under section 365 can only arise in bankruptcy. *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.").  Counts IV and V allege breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty.  The Court has related to jurisdiction over those claims because "their resolution could conceivable have an effect on the estate." *In re Allied Sys. Holdings, Inc.*, 524 B.R. 598, 607 (Bankr. D. Del. 2015).

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  FED. R. BANK. P. 7056 incorporates FED. R. CIV. P. 56 in adversary proceedings.  A party seeking summary judgment must demonstrate the absence of a genuine

dispute of material fact by establishing the absence of evidence supporting an essential element of the non-movant's case. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009). A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Ben-Levi v. Brown*, 136 S. Ct. 930 (2016). Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence. *Keen v. Miller Envtl. Grp.*, *Inc.*, 702 F.3d 239, 249 (5th Cir. 2012). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015).

A party asserting that a fact cannot be or is genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact. FED. R. CIV. P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). The Court should not weigh the evidence. *Wheat v. Fla Par. Juvenile Justice Comm'n*, 811 F.3d 702, 713 (5th Cir. 2016). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. FED. R. CIV. P. 56(c)(2). Moreover,

the Court is not bound to search the record for the non-moving party's evidence of material issues. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

"The moving party bears the initial responsibility of informing the [] court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, LLC v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence entitling the movant to judgment at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 322–24. The non-moving party must cite to specific evidence demonstrating a genuine dispute. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-moving party must also "articulate the manner in which that evidence supports that party's claim." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). Even if the movant meets its initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

## Discussion

At the heart of this dispute is Alta Mesa's belief that its owners, sitting on both sides of the negotiation table, agreed to pay Kingfisher exorbitant gathering fees. According to Alta Mesa, its value as a going concern will increase if it is able to renegotiate its gathering arrangements, either with Kingfisher or a third party. Alta Mesa hopes to reject the gathering

agreements or avoid them as preferences, fraudulent transfers, or breaches of fiduciary duty.[2] This opinion focuses on Alta Mesa's counts relating to rejection and breach of fiduciary duty.

Alta Mesa cannot reject the gathering agreements because the agreements are not executory contracts. Real property covenants are not executory and are not subject to rejection. As discussed below, the gathering agreements form real property covenants running with the land. These gathering agreements directly touch and concern Alta Mesa's leasehold interest in real property. Further, Alta Mesa and Kingfisher are in privity of estate because the covenants were made in connection with the conveyance of easements to Kingfisher. Both Alta Mesa and Kingfisher intended the gathering agreements to bind successors. Consequently, the gathering agreements formed real property covenants under Oklahoma law which cannot be rejected under 11 U.S.C. § 365(a). Therefore, the Court grants summary judgment in favor of Kingfisher on Count I. Questions of fact preclude summary judgment on Counts IV and V, relating to breaches of fiduciary duties.

## Count I — Rejection

Alta Mesa seeks a declaratory judgment that the gathering agreements did not form real property covenants under Oklahoma law, and may therefore be rejected as executory contracts. The parties (and the Court) agree that the Bankruptcy Code does not allow for the rejection of real property covenants. In order to form a real property covenant, three factors must be satisfied. First, the covenant must touch and concern real property. Second, there must be privity of estate. Third, the original parties to the covenant must have intended to bind

---

[2] The Court assumes, without finding, that rejection would be in the best interest of the estate. It is not the Court's role to assist the estate by allowing the rejection of a contract that is not executory. Since the gathering agreements are not executory, the Debtors will be required to find an alternative path to maximize recovery to the estate. Fortunately, the parties have now announced a joint undertaking to sell the gathering system and mineral interests.

successors.  For the reasons that follow, the gathering agreements satisfy all three requirements. Alta Mesa cannot reject the agreements.

The Bankruptcy Code allows debtors in possession to assume, reject, or assign executory contracts.  11 U.S.C. § 365(a).  An executory contract is one where both parties have material obligations that remain to be performed.  *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1657 (2019) (defining executory contract as "a contract that neither party has finished performing").  Rejection of an executory contract constitutes a breach of that contract by the debtor.  *Id.*

While a valuable tool, a debtor's rejection power is limited.  Contracts forming real property covenants are not executory.  *See, e.g.*, *Midlands Midstream, LLC v. Badlands Energy, Inc. (In re Badlands Energy, Inc.)*, 2019 WL 5549463, No. 17-01429, at *15 (Bankr. D. Colo. Sept. 30, 2019).  As such, if Alta Mesa's gathering agreements form real property covenants, they cannot be rejected.  *Id.*

The gathering agreements relate to real property located in Oklahoma.  (ECF No. 108 at 2).  When a dispute focuses on real property, the Court ordinarily applies the law of the state where the real property is situated.  *E.g.*, *United States v. Calcasieu Timber Co.*, 236 F. 196, 198 (5th Cir. 1916) (indicating states laws governing real property interests "are binding upon and are to be applied by the federal courts").  Thus, Oklahoma law binds this Court on two important points.  First, the Court must apply Oklahoma law regarding the formation of real property covenants.  Second, the Court looks to Oklahoma to determine the real property status of Alta Mesa's hydrocarbons.  Oklahoma draws a distinction between hydrocarbons resting beneath the ground and those that have been extracted.  Oil and gas is considered real property while it remains in the ground.  *Local Fed. Sav. & Loan Ass'n of Okla. City v. Eckroat*, 100 P.2d 261,

263 (Okla. 1940).   After the oil and gas is severed from the ground, it becomes personal property.  *Id.*

### *The Gathering Agreements Create Real Property Covenants Running with the Land*

The gathering agreements that Alta Mesa entered with Kingfisher form covenants that run with the land because the covenants touch and concern the value of Alta Mesa's real property, the covenanting parties are in privity, and the parties intended the gathering agreements to bind successors.  Thus, the agreements meet all three elements necessary to form real property covenants in Oklahoma.  Both binding decisions of the Oklahoma Supreme Court and persuasive authority from federal courts support the determination that the agreements form real property covenants.

In Oklahoma, "[a] covenant is a promise that imposes a burden on the covenantor to act or refrain from acting, and confers a benefit on the covenantee consisting of the right to require the covenantor to act or not act."  *Beattie v. State ex rel. Grand River Dam Auth.*, 41 P.3d 377, 386 (Okla. 2002) (Opala, J., concurring).   Real property covenants are those that are so connected to the underlying land that the benefit and burden pass to successors by operation of law.  *Id.*   Three elements are required to form a real property covenant: 1) the burden or benefit must "touch and concern" the land; 2) privity of estate must be present between "the party claiming the benefit and the party upon whom the burden rests;" and 3) the parties forming the covenant must intend for the burden to pass to successors.  *Id.* at 387.   Oklahoma courts do not require any 'magic words' to create a real property covenant.  *See generally Eckroat*, 100 P.2d at 262.   Instead, they focus on the intent of the covenanting parties.  *Id.* ("There is no evidence to indicate that the parties to the lease meant to create a mere personal obligation by the covenant.").

The Oklahoma Supreme Court has not determined whether oil and gas gathering agreements form real property covenants.  However, the Eight Circuit applied Oklahoma law and found that an agreement similar to the gathering agreements here creates an interest in real property.  *Sw. Pipe Line Co. v. Empire Nat. Gas Co.*, 33 F.2d 248 (8th Cir. 1929).  Two bankruptcy courts have also tackled the question, although neither dealt with Oklahoma law.  In *Sabine Oil & Gas Corp. v. HPIP Gonzales Holdings, LLC (In re Sabine Oil & Gas Corp.)*, 550 B.R. 59 (Bankr. S.D.N.Y. 2016), a bankruptcy court in New York applied Texas law and held that gathering agreements did not form real property covenants.[3]  More recently, a bankruptcy court in Colorado came to the opposite conclusion while applying Utah law.  *Badlands*, 2019 WL 5549463.

In *Empire*, the Eighth Circuit determined that a gas purchase contract created a real property interest in an oil and gas lease under Oklahoma law.  The contract at issue required the buyer to purchase "all the merchantable gas in its natural state as produced from wells then existing upon the leasehold or thereafter to be drilled."  *Empire*, 33 F.2d at 249-50.  The buyer then constructed thirteen miles of pipeline connecting the wells to a gathering system.  *Id.* at 250.  The producer later argued that the purchase agreement did not create an interest in the land because title to the gas did not pass to the buyer until it had been extracted and reduced to personal property.  *Id.* at 252.  The Eighth Circuit rejected that argument because the agreement created an easement for the buyer to build gathering pipelines, giving the buyer "some interest in the leasehold binding on the assignee thereof with notice."  *Id.*

---

[3] Sabine produced two published opinions from the bankruptcy court.  First, ruling on a motion to reject under section 365, the court allowed rejection and made a nonbinding determination that the covenants did not run with the land.  *Sabine*, 547 B.R. 66 (Bankr. S.D.N.Y. 2016).  The second opinion resolved a subsequent adversary proceeding where the gatherers sought a declaratory judgment that the covenants run with the land.  *Sabine*, 550 B.R. 59.

While the circuit court made it clear that the agreement created some binding interest in the land, it did not state whether the interest amounted to a covenant running with the land. *Id.* at 253 ("[W]e deem it of no importance as to whether such right would run with the land and the leasehold, because certain equitable rights were undoubtedly created by the contract which were enforceable according to the expressed intention of the parties against the assignee of the leasehold estate, if that assignee had notice of said rights.").

Conversely, the *Sabine* court found that certain gathering agreements did not create real property covenants under Texas law. The requirements to form a real property covenant in Texas mirror those in Oklahoma. The New York bankruptcy court held that the gathering agreements did not touch and concern real property and that the parties lacked privity. That court set out three aspects of the gathering agreements that supposedly indicated that those agreements did not touch and concern real property. First, the debtor-producer retained the right to operate its wells without input from its gatherers. *Sabine*, 550 B.R. at 67. Second, the agreements obligated the gatherers to connect their gathering systems at receipt points and "not directly to [the debtor's] wells." *Id.* Third, the gathering fees were triggered by the gatherers' receipt of hydrocarbons, not by the extraction of hydrocarbons from the ground. *Id.* Additionally, *Sabine* suggested that, because a conveyance of real property constituted a default event under the debtor's secured credit agreement, the gathering agreements could not have created real property covenants without placing the debtor in default. *Id.*

The *Sabine* court also found that the parties lacked privity of estate. In Texas, as in Oklahoma, privity requires that a covenant be made in conjunction with a conveyance of property. Because the covenant in *Sabine* was not formed alongside a conveyance of a fee mineral estate, the court found that privity was not present. *Id.* at 69. The court acknowledged

that the gathering agreements granted easements in the surface estate in order to facilitate construction and operation of the gathering system. *Id.* However, because surface and mineral interests are severable property rights, the court found that the conveyance of a surface easement did not support privity with respect to the debtor's mineral interests. *Id.*

*Badlands* distinguished *Sabine* and held that a natural gas gathering agreement may run with the land in Utah. 2019 WL 5549463. The elements necessary to form a real property covenant in Utah are identical to those in Oklahoma. *See Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 623 (Utah 1989). The *Badlands* court found that the gathering agreements touched and concerned the land because "[t]he underlying objective of the agreements [is] to compensate for the burdens imposed by and upon the mineral and surface estates' property interests . . . for the production of natural gas." *Badlands*, 2019 WL 5549463 at *9. Further, Utah law called for a broad interpretation of the interests dedicated to the gatherer, which supported finding the formation of a real property covenant. *Id.* at *10. Finally, *Badlands* expressly disagreed with *Sabine's* privity analysis and found that the grant of a surface easement to a gatherer is a conveyance creating privity with an oil and gas lessee. *Id.* at *14 ("Here, unlike in *Sabine*, the covenants burden Producers' real property interests . . . in the context of a simultaneous conveyance of real property interests . . . to [the gatherer], both of which are located in the same geographic area.").

Of course, *Sabine* and *Badlands* were decided on their facts. The Court assumes that unique facts in *Sabine* led to that court's conclusions. To the extent that the pronouncements in *Sabine* were intended to be generalized, this Court must reject them. Applying Oklahoma law, and considering the precedent set by other federal courts, this Court finds that the Alta Mesa gathering agreements satisfy all three elements needed to form real property covenants. *Empire*

and *Badlands* give effect to the parties' intent and focus on the mineral lease interests conveyed to the gatherer.  Here, the gathering agreements touch and concern Alta Mesa's mineral leases, privity is present, and both parties intended that the covenants bind successors.

*The Gathering Agreements Touch and Concern Land*

The gathering agreements touch and concern the Alta Mesa oil and gas leases because both the benefits and the burdens of the covenants affect the value of Alta Mesa's real property interests.  Kingfisher used its surface easement to build a modern gathering system for the dedicated wells, which enhances the value of Alta Mesa's leases.  On the other hand, the gathering agreements impose costs and delivery restrictions on produced hydrocarbons, which diminish the value of Alta Mesa's unproduced reserves.  Thus, there is a logical connection between both the burden and benefit of the covenants and Alta Mesa's real property.  This simple fact persists even though Kingfisher is not entitled to possession until after the hydrocarbons become personal property.

The touchstone necessary for a covenant to touch and concern real property is that there must be "a logical connection between the benefit to be derived from enforcement of the covenant and the property." *Beattie*, 41 P.3d at 388.  A covenant touches and concerns the land when it requires performance of a physical act upon the land which directly benefits the landowner.  *Id.* at 389.  The Oklahoma Supreme Court has acknowledged that numerous scholarly articles articulate the touch and concern standard in expansive detail.  *Id.* at n.31.  Generally, these articles ask whether the covenantor's legal interest with respect to the land is rendered more or less valuable by the covenant?  *See generally id.*  If the value of the owner's interest in the land itself is affected by the covenant, either positively or negatively, the covenant touches and concerns the land.  *See id.*; *see also El Paso Refinery, LP v. TRMI Holdings, Inc. (In*

*re El Paso Refinery, LP)*, 302 F.3d 343, 357 (5th Cir. 2002) ("Moreover, even when a covenant impacts the value of land, it must still affect the owner's interest in the property or its use in order to be a real covenant.").

To determine whether the gathering agreements touch and concern real property, it is necessary to determine the property interests that Alta Mesa holds. The gathering agreements relate to Alta Mesa's oil and gas leases. An oil and gas lease creates an interest in land to "search for and reduce to possession such [oil and gas] as might be found" beneath the land. *Hinds v. Phillips Petroleum Co.*, 591 P.2d 697, 698 (Okla. 1979). In effect, an oil and gas lease is a grant of the minerals to be captured from the premises. *Id.* An oil and gas lease also creates an implied surface easement which "extends to such parts of the leased premises as are reasonably necessary for the purpose of exploration or production." *Id.* at 699. Although the lease acts as a grant of the minerals to the lessee, under the rule of capture, title to the underlying hydrocarbons is not acquired until they are "reduced to actual possession and controlled." *Atlantic Richfield Co. v. Tomlinson*, 859 P.2d 1088, 1095 (Okla. 1993). The lessee holds "the rights and privileges that are necessary for profitable production," of minerals. *See Nilsen v. Tenneco Oil Co.*, 614 P.2d 36, 43 (Okla. 1980).

An oil and gas lease is distinguishable from a fee simple mineral estate. Although overlapping in many respects, a fee mineral estate contains a separate collection of rights. Ownership of a fee mineral estate includes the power to lease, the right to receive bonuses, the right to receive delay rentals, and the right to receive royalties. *Sharp v. Gayler*, 737 P.2d 120, 122 (Okla. Civ. App. 1987). Additionally, the owner of a fee mineral estate holds the rights of ingress and egress. *Fransen v. Eckhardt*, 711 P.2d 926, 930 (Okla. 1985). As with a lease, title

to hydrocarbons on the estate is not acquired until the hydrocarbons are reduced to possession. *Atlantic Richfield*, 859 P.2d at 1095.

The Alta Mesa gathering agreements dedicate to Kingfisher the products of oil and gas leases, not the products of fee mineral estates.   (ECF No. 107 at 4).   Entering into the agreements, Alta Mesa possessed a bundle of rights that included the right to search for and reduce hydrocarbons to possession, surface easements for exploration and production, and other rights and privileges necessary for profitable production.   Those leasehold rights exist to facilitate the capture of hydrocarbons.   Unlike in *Sabine*, where that court focused its inquiry on a fee mineral estate, the relevant starting point here is Alta Mesa's leasehold interest.   547 B.R. at 76 (listing five real property rights comprising a fee mineral estate under Texas law).

*Sabine* drew a distinction between covenants concerning the surface estate and those that concern the mineral estate.   That distinction is far from semantic.   An oil and gas lease contemplates extraction of hydrocarbons for profit.   All of the property interests associated with an oil and gas lease are necessary for the lessee to successfully explore and produce his reserves. Those leasehold interests, targeted at the production of hydrocarbons, are the real property interests which the Alta Mesa gathering agreements involve.

Having identified Alta Mesa's real property interests, the Court finds that the covenants of the gathering agreements touch and concern those interests.   The original gathering agreements included four relevant covenants.   First, the agreements dedicated all of Alta Mesa's produced hydrocarbons for delivery to Kingfisher.   Second, the agreements included sections titled "Covenants Running With Land" which required recordation and required transferees to affirm the agreements.   Third, they created surface easements allowing Kingfisher to build and maintain the gathering system.   Finally, the agreements set out the fixed gathering fees.   The

amended gathering agreements added two more relevant covenants: the transportation conveyances, and the reduced gathering fees.

These gathering agreements touch and concern land because both the burdens and benefits are logically connected to Alta Mesa's leasehold interests in real property. Pursuant to the agreements, Kingfisher built a modern gathering system. That system was intended to benefit the oil and gas leases by facilitating the collection of produced reserves. In addition to the potential benefits, various covenants in the agreements burden the leases. The surface easement limits Alta Mesa's possessory interest in its leases. By dedicating nearly all of its production to Kingfisher, Alta Mesa also burdened its interests under the oil and gas leases by restricting its right to seek a different gatherer or build its own gathering system. In the current market, the fixed fee arrangements burden the leases because if Alta Mesa decides to drill, the production will be less profitable than it might be on more favorable gathering terms.

The gathering system, which Kingfisher constructed in furtherance of the agreements, enhances the value of Alta Mesa's unproduced reserves. Because the gathering system enhances the value of the reserves themselves, not simply Alta Mesa's personal interest in the reserves, there is a logical connection between the covenant calling for the construction of the gathering system and the value of the reserves. *See Beattie*, 41 P. 3d at 389; *El Paso Refinery*, 302 F.3d at 357. Once a well is linked to an accessible gathering system, the system not only benefits the produced reserves as they travel towards collection, it enhances the value of unproduced reserves which may be extracted in the future. Just as a home without access to a road is less valuable than one facing the street, a solitary oil and gas lease is less valuable than one attached to a gathering grid. As a result of the gathering agreements, Alta Mesa's current and future wells have access to a modern, efficient gathering system. The availability of the gathering system

increases the value of Alta Mesa's reserves because it reduces the transportation costs associated with future production.

While the gathering system itself benefits Alta Mesa's reserves, other covenants burden Alta Mesa's interests for three reasons.  First, the surface easement logically connects with and burdens Alta Mesa's real property.  *See Newco Energy v. Energytec, Inc. (In re Energytec, Inc.)*, 739 F.3d 215, 224-25 (5th Cir. 2013) (finding pipeline right of way burdened underlying property); *Empire*, 33 F.2d at 252.   Alta Mesa's leases grant it easements to develop hydrocarbons.  The gathering agreements carve out a portion of Alta Mesa's lease easements and grant those portions to Kingfisher.  This reduces Alta Mesa's real property interest under the leases.   Contrary to the holding in *Sabine*, the surface easements directly affect the lessee's underlying mineral interest.  The *Sabine* court found that a surface easement does not touch and concern the mineral estate because the surface and mineral estates consist of separate bundles of sticks.  550 B.R. at 66-67.  However, in the context of an oil and gas lease, the surface easement is integral to the lessee's ability to realize the value of its mineral reserves.  Without the surface easement, the lessee cannot capture reserve hydrocarbons.  The covenants granting Kingfisher surface easements directly burden Alta Mesa's interest in the reserves because they restrict Alta Mesa's use of the surface land for drilling or exploration.

Second, the dedication of the produced hydrocarbons to Kingfisher restricts Alta Mesa's use of its reserves.  Prior to the gathering agreements, Alta Mesa was free to arrange for the gathering of its product in any way it saw fit.  Alta Mesa could have continued to use its existing system.  Or, as it did here, Alta Mesa could contract to have a third party build a new system. Alternatively, Alta Mesa could have developed a new system itself and gathered its own product. By committing itself to the gathering agreements with Kingfisher, Alta Mesa gave up its right to

pursue other gathering strategies.  While Alta Mesa retained the right to determine whether and when to capture its mineral reserves, it surrendered the right to determine what happens to the reserves once it drills.  *Contra Sabine*, 550 B.R. at 67.  In turn, the value of Alta Mesa's reserves suffer because the company cannot now pursue a more favorable agreement.

Third, the fixed fee arrangements diminish the value of Alta Mesa's reserves in a depressed hydrocarbon market.  The fixed fees set uniform prices for gathered oil and gas.  In favorable market conditions this might benefit Alta Mesa.  Alta Mesa might realize greater profits than if it paid percentage-based fees.  However, as oil and gas prices decrease, the fixed fees steadily diminish Alta Mesa's returns and burden the value of its reserves.  Although the fees are not paid until hydrocarbons become personal property, the fixed fee arrangement necessarily impacts Alta Mesa's drilling schedules and use of its leaseholds.  The reserves are made less valuable because if they are extracted, Alta Mesa must pay above market gathering fees.  Thus, the fixed fees logically and directly impact the value of the reserves.

Piecing these covenants together, their connection to Alta Mesa's real property is apparent.  Although Kingfisher's right to delivery is conditioned upon extraction, its interest affects the reserves even as the hydrocarbons remain undisturbed.  All interested parties know that if Alta Mesa decides to drill, the product must be delivered to Kingfisher.  The Alta Mesa leases are burdened by the pledge to Kingfisher because the value of the unproduced reserves is decreased by the fixed gathering fees.  This is precisely why Alta Mesa seeks to reject the gathering agreements.  While Kingfisher's right to delivery springs at the instant when the reserves reach the surface and become personal property, its interest has touched and concerned Alta Mesa's mineral leases since the execution of the gathering agreements.

*Alta Mesa and Kingfisher are in Privity of Estate*

The second element required to form a real property covenant in Oklahoma is privity of estate.  Two types of privity of estate are recognized at common law: vertical and horizontal. *Beattie*, 41 P.3d at 387.  Vertical privity relates to the relationship between the present owner of the land and the original parties to the covenant.  *Id.*  Vertical privity is irrelevant in this case because Alta Mesa and Kingfisher have not transferred their interests.

Horizontal privity refers to the relationship between the original parties to the covenant. *Id.*  Historically, "horizontal privity existed only if the covenantor and covenantee created the covenant in connection with a conveyance of an estate from one to the other."  *Id.* (citing *Flying Diamond*, 776 P.2d at 628).  While a conveyance of a fee simple estate satisfies horizontal privity, conveyances of lesser estates have also been found sufficient.  *E.g.*, *O'Neil v. Vose*, 145 P.2d 411, 414 (Okla. 1944) ("[W]e are not unmindful of the legal right of owners of adjoining properties to bind themselves by enforceable contract, restraining the use of their property for an unlimited period of time, wherein each separate owner grants . . . a right in his property in the nature of an easement which shall run with the land. . . .").

The parties dispute whether horizontal privity is required under Oklahoma law.  This Court need not decide that issue.  If horizontal privity is required, it exists under the facts of this case.  The reasons why are given below.

<u>Vertical Privity</u>

Vertical privity exists "when the person presently claiming the benefit, or being subjected to the burden, is a successor to the estate of the original person so benefited or burdened." *Beattie*, 41 P.3d at 389.  Alta Mesa and Kingfisher agree that vertical privity is present here. Alta Mesa and Kingfisher are the original covenanting parties.  Thus, there is no present dispute

as to whether the gathering agreements bind subsequent transferees.  Recording of an interest in real property places buyers on inquiry notice of the interest.  *See*, *e.g.*, *Jack Bell Lumber Co. v. Will*, 383 P.2d 691, 694 (Okla. 1963).  These agreements were recorded.  Thus, any transferee would be charged with knowledge of the gathering agreements, which would satisfy vertical privity.  *See Empire*, 33 F.2d at 253.

Horizontal Privity

The parties dispute whether horizontal privity is required to create a real property covenant in Oklahoma.  But if horizontal privity is necessary, it is present here.  Horizontal privity arises when the covenant is created in conjunction with a conveyance of an estate in property.  *Beattie*, 41 P.3d at 387.  The gathering agreements gave Kingfisher a surface easement to construct and maintain the gathering system.

Although less than a fee simple estate, the easements conveyed to Kingfisher a possessory interest in the leasehold estate.  The surface easement is integrally tied to the purpose of an oil and gas lease.  The conveyance of the easements to Kingfisher is enough to show horizontal privity with respect to the gathering agreements.  *See O'Neill*, 145 P.2d at 414.  In *Sabine*, the court found that the gatherers' surface easement did not create horizontal privity with respect to the producer's mineral estate.  550 B.R. at 69.  However, *Sabine* centered its analysis around fee mineral estates, not oil and gas leaseholds.  Alta Mesa's surface easements spring directly from its leasehold mineral interests.  Because a surface easement is a crucial component on an oil and gas lease, the Court does not view this conveyance as creating privity only with respect to the surface estate.  *See Badlands*, 2019 WL 5549463, at *14.  *But see Sabine*, 550 B.R. at 69.  Instead, it supports a finding that the covenants were created alongside the conveyance of

a property interest in Alta Mesa's leasehold estates.  For those reasons, the gathering agreements satisfy the requirement of horizontal privity.

### *Alta Mesa and Kingfisher Intended for the Agreements to Run with the Land*

The final element necessary to create a real property covenant is that the original parties must intend that the covenant run with the land.  *Beattie*, 41 P.3d at 389.  Intention should be determined by looking at the "entire agreement construed as a whole."  *Baker v. Conoco Pipeline Co.*, 280 F. Supp. 2d 1285, 1298 (N.D. Okla. 2003).  Provisions within the agreement that purport to bind successors and assigns are consistent with an intent to create a real property covenant.  *See id.*  Provisions that require recording of the agreement also support a finding that the parties intended the covenant to run with the land.  *See id.*

Based upon the language of the gathering agreements, original and as amended, the parties expressed the intent to bind successors.  Each of the agreements states that it is "a covenant running with the land."  On their own, those recitations do not create real property covenants; however, the provisions memorialize the parties' intent to bind successors to real covenants.  Additionally, those provisions require that the dedications be recorded.  Recording puts subsequent purchasers on notice of real property covenants.  *Will*, 383 P.2d at 694.  Finally, the gathering agreements also contain language requiring the parties to obtain affirmation that a transferee will uphold the party's obligations under the agreements.  These provisions show a clear intent to bind successors to the covenants of the gathering agreements.

Further, Jeff Hostettler, who negotiated the original gathering agreements on behalf of Kingfisher, stated that the parties intended for the gathering agreements to create real property covenants.  At his deposition, Hostettler stated that the parties' "understanding was [the gathering agreement] was a gathering agreement that had covenants running with the land."

(ECF No. 112 Ex. 3 at16).   Further, Kingfisher submitted correspondence from Alta Mesa's outside counsel during the negotiations of the 2016 amendments which illustrate an understanding that the parties intended that the original agreements formed real property covenants.  (ECF No. 112 Ex. 11 at 1).  Alta Mesa has not provided evidence to refute these statements of intent.

The gathering agreements between Alta Mesa and Kingfisher satisfy all three elements necessary to form real property covenants in Oklahoma.  The agreements touch and concern Alta Mesa's real property, horizontal and vertical privity are present, and the parties intended the agreements to bind successors.  For those reasons, the gathering agreements form covenants running with the land.  The gathering agreements are therefore not executory, and Alta Mesa may not reject them in bankruptcy.

### Counts IV & V – Fiduciary Duty

Counts IV and V of the amended complaint allege breaches of fiduciary duties by Alta Mesa's directors, as well as aiding and abetting breaches of fiduciary duty by Kingfisher.  Count IV seeks authority to void the gathering agreements because the AMH owners, who also controlled Kingfisher, breached their duty of loyalty by sitting on both sides of the table during the gathering agreement negotiations.  Count V alleges that Kingfisher aided and abetted the fiduciary breaches set out in Count IV.

AMH and OEA are Texas limited partnerships, governed by Texas corporate law. "Corporate officers and directors owe a strict fiduciary obligation to their corporation."  *Landon v. S & H Mktg. Grp., Inc.*, 82 S.W.3d 666, 672-73 (Tex. App. 2002).  The duty of loyalty is one part of an officer's fiduciary duty.  *Id.*  The duty of loyalty demands that an officer act in good faith and refrain from placing his personal interests above those of the corporation.  *Gearhart*

*Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719 (5th Cir. 1984). Transactions are subject to strict judicial scrutiny when an officer or director has a personal financial interest in the transaction. *Id.* at 720. Officers are interested in a transaction when they have a financial or ownership interest on both sides of the deal. *Landon*, 82 S.W.3d at 673.

In Texas, a wholly owned subsidiary does not have interests separate from its owners. Parent companies do not owe fiduciary duties to their wholly owned subsidiaries. *Resolution Tr. Corp. v. Bonner*, 1993 WL 414679, at *3 (S.D. Tex. June 3, 1993). However, officers and directors of the parent owe fiduciary duties to the parent's shareholders.

Kingfisher's argument in favor of summary judgment assumes that Chappelle, HMI, and Ellis owned 100% of AMH. In turn, AMH owned 100% of OEA. Those three owners all participated in the gathering agreement negotiations. Because under Texas law, wholly owned subsidiaries do not have interests separate from their owners, the owners owed no duty to AMH or OEA. However, Kingfisher acknowledges that the owners owe a duty to AMH shareholders. Because all three AMH owners were involved in the negotiations, they could not have breached their duty of loyalty to one another. At the oral argument on November 22, 2019, Alta Mesa pointed out that a fourth individual, Dale Hayes, owned a 0.45% stake in AMH. Mr. Hayes apparently did not play a role in the negotiations of the gathering agreements. Kingfisher's motion for summary judgment failed to account for this minority owner. The existence of an absentee owner defeats Kingfisher's argument because the other owners owed fiduciary duties to him. Whether they breached those duties is a disputed question of material fact regarding the negotiation of the gathering agreements.

Questions of fact preclude summary judgment on Count IV. Summary judgment is similarly inappropriate with respect to Count V. The Court cannot determine whether Kingfisher

aided and abetted a breach of fiduciary duty without first determining whether a breach of fiduciary did in fact occur.

## Conclusion

The gathering agreements may not be rejected.  All other issues are reserved for trial.

SIGNED **December 20, 2019.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE